IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Suniaga, et al. | : | CIVIL ACTION |
| | : | NO. 20-2283 |
| | : | |
| v. | : | |
| | : | |
| | : | |
| Downingtown Area School | : | |
| District, et al. | : | |

## MEMORANDUM DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTIONS TO DISMISS

EDUARDO C. ROBRENO, J.                    December 2, 2020

## TABLE OF CONTENTS

I.  INTRODUCTION ............................................... 2

II. FACTUAL BACKGROUND ......................................... 4

III. LEGAL STANDARD............................................. 24

IV.  DISCUSSION................................................. 26

   A. The School District Defendants' Motion to Dismiss ............. 26
      1.  Count I.................................................. 26
      2.  Count II................................................. 29
      3.  Count III................................................ 37
      4.  Count IV................................................. 37
      5.  Count V.................................................. 38
      6.  Count VI................................................. 41
      7.  Count VII and Count X.................................... 41
      8.  Count VIII............................................... 43
      9.  Count IX................................................. 44
      10.   Count XI............................................... 45
      11.   Immunity Doctrines..................................... 46
      12.   Punitive Damages...................................... 47

   B. Rebecca German's Motion to Dismiss .......................... 48
      1.  Count V.................................................. 48
      2.  Count VI................................................. 48
      3.  Count VII and Count X.................................... 48
      4.  Count VIII............................................... 49
      5.  Count IX................................................. 50
      6.  Count XI................................................. 52

    C.  Leave to Amend ............................................. 52

V.  CONCLUSION .................................................. 53

I.    INTRODUCTION

     Plaintiffs in this case are Leo Suniaga and his wife,
Jacquelyn Suniaga.[1] Leo Suniaga (hereinafter, "Suniaga") was
employed by Downingtown Area School District (DASD) as a
health/physical education teacher until he was allegedly
constructively discharged after facing disciplinary action and
scorn by some parents over comments allegedly made by him to
sixth-grade students in one of his health classes. There are two
groups of Defendants in this case: School District Defendants
and non-School District Defendants. The School District
Defendants in this case are Downingtown Area School District,
Dr. Emilie Lonardi (Superintendent), Sharon Standish (former HR
Director), Thomas Mulvey (Principal of Marsh Creek Sixth Grade
Center), and Dr. Dawn Lawless (Principal of Beaver Creek
Elementary School). The non-School District Defendants are Megan
Murphy, Rebecca German, Lisa Gulati, and Jennifer Chicosky, who
are parents of children in the DASD and local residents.

     Suniaga and his wife bring eleven counts: I) Violation of
due process pursuant to 48 U.S.C. § 1983 (property interest in

---

[1]     Although Jacquelyn Suniaga has an independent claim for loss of
consortium, it is derived from Leo Suniaga's claims. Consequently, we will
hereinafter refer to his claims as "Plaintiffs' claims" for clarity.

continued public employment) against all School District
Defendants; II) Violation of due process pursuant to 48 U.S.C. §
1983 (liberty interest in reputation) against all School
District Defendants; III) Violation of substantive due process
pursuant to 48 U.S.C. § 1983 (equal protection of law) against
all School District Defendants; IV) Request for declaratory
judgment against DASD; V) Conspiracy to deprive Suniaga of his
constitutional rights against all individual Defendants; VI)
Claim for attorneys' fees and costs pursuant to 42 U.S.C. § 1988
against all Defendants; VII) State law claims for defamation
against all individuals named as Defendants; VIII) Intentional
infliction of emotional distress against all individuals named
as Defendants; IX) Intentional interference with contractual
relations and prospective contractual relations against all
individuals named as Defendants; X) Invasion of privacy and
false light against all individuals named as Defendants; and XI)
Loss of consortium against all Defendants.

In response, Defendants DASD, Principal Lawless,
Superintendent Lonardi, Principal Mulvey, and former HR Director
Standish filed a Motion to Dismiss for failure to state a claim.
Rebecca German (a non-School District Defendant) filed a
separate Motion to Dismiss for failure to state a claim.

## II.  FACTUAL BACKGROUND[2]

Plaintiff Leo Suniaga was employed by Downingtown Area School District (DASD) as a health and physical education teacher. He taught in the DASD elementary school for nineteen years until he was asked to switch to the Marsh Creek Sixth Grade Center (MCSC) beginning with the 2014-2015 school year. All physical education and health classes at MCSC are coed, and all students receive the same instruction in accordance with the specific curriculum approved by Defendants DASD, Principal Mulvey, and Superintendent Lonardi.

During the 2018-2019 school year, a new learning unit on Human Growth & Development was introduced into the health class curriculum at MCSC. The unit began during the last week of April 2019, and the second class session covered "Adolescence a Time of Change" from the students' textbook. In presenting the material, Suniaga read from the textbook verbatim, telling students:

> [T]hink about how your body has changed in the last few years . . . . Look at any group of teens, and you'll probably see big differences between the individuals. One teen may be a head taller than another who is the same age. Some teens may look younger or older than they really are. These differences are caused by the changes teens go through during adolescence.

---

[2]    For purposes of deciding these two Motions to Dismiss, the facts alleged in the Amended Complaint are accepted as true and viewed in the light most favorable to the Plaintiffs at this stage of the litigation.

Am. Compl. ¶ 33, ECF No. 5.

According to the Amended Complaint, Suniaga then observed that the students could see the changes they and their classmates had gone through since the beginning of the school year, and that as the textbook states, students go through these changes and they occur at different times and speeds for each student. To make the students feel more comfortable as they contemplated where they were in the puberty process, Suniaga stated that some students were eleven years old and some twelve years old and asked for a show of hands. He then asked if the students had observed a big differential in height and development, saying "some of you are taller, some of you are shorter," and words to that effect. Id. ¶ 34. As an example, he pointed out that one particular female student grew taller from the beginning of the year and that one particular male student had grown taller than others, but stated that the process continues and students catch up over time. Suniaga also stated that he was the shortest kid in his class until he caught up in seventh grade.

While going through the written material and the images on the page showing a male and a female, Suniaga explained that as students their age go through puberty, their bodies change and they begin to look older and more like adults. Suniaga asked the students if they felt they looked older or younger than their

age and then compared the changes that males go through versus females exactly as the textbook outlined. The figures in the textbook show that males accumulate less body fat to muscle than females, so Suniaga explained that the difference did not mean that girls were fatter than boys, but only that the ratio of muscle to fat was different.

At one point, according to the Amended Complaint, a student asked why girls shave their legs and boys do not, to which Suniaga replied that it was culturally related and that many girls in this country shave their legs, and then asked for a show of hands. Approximately twelve girls raised their hands. Suniaga also replied to questions from boys regarding shaving their lips and faces and made similar queries of the boys.

On May 7, 2019, while teaching the Human Growth & Development unit, Suniaga was told to report to Principal Mulvey's office after finishing classes. The meeting included Mulvey, former HR director Standish, and Suniaga's local Union President.[3] Suniaga was told he was being placed on administrative leave with pay pending an investigation. Despite asking several times, Suniaga was not provided with any information about the reason for his leave, and Mulvey said he

---

[3]     The Union is an affiliate of the Pennsylvania State Education Association (PSEA), which in turn is an affiliate of the National Education Association (NEA).

would be advised of the investigation results shortly. Suniaga
was then asked to leave school, not return until further notice,
and refrain from any contact with students/DASD personnel.
Suniaga remained on administrative leave with pay for the
remainder of the week, receiving no further information.

On May 14, 2019, Suniaga received a Notice of Allegations
letter from former HR Director Standish, informing him of four
allegations to be addressed on May 17 at an informal hearing
(hereinafter, the "Loudermill hearing"). The allegations related
to a health class Suniaga taught on May 6 as well as a brief
discussion Suniaga had with another student several days before
while accessing the school website to submit student grades on
his laptop. The letter suggested that if the allegations were
true, they "may constitute neglect of duty, persistent
negligence in the performance of duties, persistent and willful
violation of school laws, and improper conduct." Id. ¶ 46. The
letter was the first time Suniaga was provided with the
allegations.

By the time Suniaga received the letter, his absence from
teaching was the subject of increasing speculation at MCSC. A
colleague(s) called Suniaga to say that one teacher overheard a
female student bragging about getting Suniaga fired, and another
teacher heard that Principal Mulvey received a report from that

student's parent that some boys teased her about her physical development after attending Suniaga's class. The parent believed the reason for the teasing was that Suniaga made an inappropriate remark about their daughter's physique. Based on a written order from the School District Defendants (DASD, Superintendent Lonardi, former HR director Standish, Principal Mulvey, and Principal Lawless (from Beaver Creek Elementary School)), Suniaga was prevented from discussing the allegations with colleagues or conducting his own investigation to prepare a defense.

Due to one or more of the Defendants' unavailability, the Loudermill hearing was rescheduled from May 17 to May 29, which was nine days before the end of the school year. On May 29, Suniaga appeared with his Union representatives at the hearing, which was conducted by DASD Attorney Levin. Suniaga claims that in spite of the numerous representations of what was allegedly reported to the Defendants by students or an unnamed parent, at no time prior to, during, or after the hearing did DASD produce any evidence to support any of the allegations, nor produce any witnesses. Levin also never produced any of the written statements he alleged established that Suniaga was lying about what he said in class.

After the hearing, Suniaga's Union representatives allegedly said that Superintendent Lonardi was adamant about firing Suniaga, but Levin stated it would necessitate further adjudicatory proceedings and that a thirty-day suspension would be severe enough to potentially cause Suniaga to resign. Suniaga's Union representatives also advised him that he could not finish teaching the remainder of the school year and that a deal was being offered for Suniaga to accept a nine-day suspension without pay in lieu of the thirty-day suspension without pay on the condition that he sign a Release and Settlement Agreement releasing the School District Defendants from any and all claims that Suniaga might bring. The proposed agreement also contained a last chance provision allowing DASD to thereafter terminate Suniaga's tenured employment for any conduct deemed to be "improper" in its sole discretion. The provision stated that such a determination would not be subject to challenge.

On July 26, 2019, Suniaga received a copy of the proposed Release and Settlement Agreement as well as a partially completed draft of a Notice of Directives letter which outlined the terms of the thirty-day suspension that would be imposed if he did not sign the Release and Settlement Agreement. In addition to the loss of approximately 20% of his yearly salary, the Notice of Directives included additional discipline that he

would receive: (1) an unsatisfactory rating in professionalism for the school year; (2) reassignment to a different school for 2019-2020; and (3) training as directed by DASD.

The Notice of Directives also contained a "last chance" warning that stated Suniaga was required to comply with certain directives. One of the directives, titled "References to Personal Traits," stated "You must not make any statements about any student regarding any personal trait such as height, weight, smell, odor, development, intellect, etc. You must not share your personal stories with students. Teachers can be effective and connect with students without personalizing instruction." Id. ¶ 70. The Notice further provided that "[i]f you engage in any improper conduct with any student, you will be discharged regardless of whether the nature of the improper conduct is expressly described herein or not." Id.

Suniaga chose not to accept the Release and Settlement Agreement. Instead, the Union filed a grievance on Suniaga's behalf regarding DASD's proceedings against Suniaga and the punishment imposed. Suniaga then received an email from former HR Director Standish advising him that he was being transferred to Beaver Creek Elementary School (BCES) for the 2019-2020 school year. Thereafter, Suniaga attended a meeting with BCES Principal Lawless and MCSC Principal Mulvey during which he

signed his MCSC exit paperwork and BCES reassignment. Lawless commented that there was some concern about Suniaga's transfer, but she hoped it would be a fresh start and that Suniaga would have a good experience.

Suniaga and other teachers were scheduled to report to school on August 19-22, 2019, to prepare for the school year and to attend Back to School Nights for parents on August 20-21. On August 17, Lawless left a voicemail on Suniaga's home phone stating that something came up and to call her as soon as possible. Before Suniaga could call back, Lawless emailed him on August 18 stating that some BCES parents were raising concerns about Suniaga's transfer. The email stated that an iPetition was posted online which had "blown up" the matter, causing a growing number of parents to become involved and protest Suniaga's transfer. Lawless said she would speak with Suniaga further at school the next day.

After reading the email, Suniaga googled himself and saw the iPetition near the top of the list of returned websites. It also appeared prominently when searching words such as "BCES" and "DASD." Defendant Murphy and others created the iPetition on August 17, 2019, and there were allegedly numerous false, nasty, and outrageous comments posted on it. Based on private information appearing in the initial iPetition heading that was

part of Plaintiff's confidential employment records, as well as what appeared to be communications posted by School District Defendants, Suniaga alleges that the School District Defendants also played a role in the iPetition's creation.

Comments were posted on other social media sites as well. The sites which contain most of the communications published by the Defendants are (1) iPetition "Say NO to Mr. Suniaga at BCE" (https://www.ipetitions.com/petition/say-no-to-mr-suniaga-at-bce), (2) Facebook page "Concerned Beaver Creek Parents (No Mr. Suniaga at BC)" (https://m.facebook.com/groups/437756746812176/), and (3) the first page of the "Beaver Creek Parents" group page on the Downingtown Borough Community Page. Id. ¶ 79; see also id. Ex. A. Suniaga read postings allegedly made by Principals Mulvey and Lawless, in addition to an anonymous letter claiming to know the "facts that were established" at the Loudermill hearing. Id. ¶ 80.

Suniaga also saw a communication from Mulvey ("the Mulvey correspondence") to MCSC parents that predated the Notice of Allegations he received before the Loudermill hearing. The correspondence allegedly revealed allegations that Suniaga was never informed of, implied Suniaga had committed further inappropriate acts and engaged in unlawful conduct, and sought

for parents to question their children and come forward in confidence with additional allegations that could prove the existing misconduct reports. When published on May 13, 2019, the Mulvey correspondence became available to the parents of all sixth graders (approximately 1,100) and to anyone subscribed to the DASD parentlink or Blackboard service platforms maintained by DASD.

Suniaga alleges that before the 2019-2020 school year, Principal Lawless communicated with one or more of the non-School District Defendants who were forming the ad hoc BCES parent groups intended to protest Suniaga's transfer. Specifically, Suniaga claims Lawless communicated with Murphy, who was the President of the BCES Home and School Association, the creator of the iPetition, and a founding member (together with the other non-School District Defendants) of the MomAdvice Facebook page, which was redirected for the purpose of publishing allegations about Suniaga. During these communications, Lawless allegedly disclosed to Murphy (and potentially others) confidential employment information regarding Suniaga that included the Loudermill hearing allegations/proceedings, as well as the Mulvey correspondence and other "gossip" about Suniaga. Id. ¶ 26. Around this time, the School District Defendants allegedly began to formulate a plan to constructively terminate Suniaga's employment by seeking

complaints from parents and students that would be sufficient to fire him or lead to investigations that would cause his employment conditions to become so intolerable Suniaga would feel forced to resign.

The non-School District Defendants continued to post statements claiming to know facts that established Suniaga's inappropriate/illegal conduct, which Suniaga felt made it impossible for him to teach at BCES. One example of this occurred when the ad hoc group "Beaver Creek Parents" (allegedly founded by Defendants Murphy, German, Gulati, and Chicosky) published an email to the School District Defendants and all "Beaver Creek Parents" which stated that "Suniaga was suspended during the 2018-19 school year after making inappropriate comments about his female students' breast development in front of the class. After an investigation, he [was] disciplined and unable to return to Marsh Creek, so the district transferred him to teach our elementary students at Beaver Creek." Id. Ex. A 10.

Between August 17 and August 23, 2019, School District Defendants Leonardi, Lawless, and Standish each allegedly communicated with parents and others to discuss plans to protect students from Suniaga, told them to report any misconduct from Suniaga, and implied that further allegations would result in Suniaga not being allowed to teach at BCES. On several

occasions, the School District Defendants advised parents and
others that a plan was being implemented that included: 1)
hiring a teacher to supervise Suniaga in his school activities;
2) allowing parents to come to Suniaga's class throughout the
day to observe him interact with their children; and 3)
assigning members of the volunteer "WatchDog" group to be around
Suniaga during the first week or so of school. These
communications continued to encourage parents to report any
allegations of misconduct by Suniaga and promised to fully
investigate and take appropriate action. Many parents posted
comments on social media that Suniaga must have done highly
inappropriate things if DASD was going to such considerable
lengths to protect students. The School District Defendants did
not seek consent or notify Suniaga of any of the communications
concerning him that they had with parents and others.

The comments on social media sites allegedly created by
Defendants Murphy, German, Gulati, and Chicosky grew to over 300
comments, and included increasingly hostile comments by third
parties such as (1) Suniaga should be put on the sex offender
registry, (2) he should not be allowed direct contact with
children, (3) he should be banned from teaching, (4) his
teaching credentials should be revoked, (5) he has a history of
inappropriate conduct based on reports by numerous students on
multiple occasions, (6) characterizing what occurred in the

prior year as horrifying, (7) he was an idiot who needed his teaching certificate revoked, and (8) he should be killed.

Although Suniaga was aware of the iPetition and could monitor comments, he was unaware of the communications between parents and the School District Defendants that were not posted on social media. Shortly before the first Back to School Night on August 20, 2019, Suniaga was alerted to a potential death threat posted on the iPetition, so he contacted the Union's counsel, who advised DASD that Suniaga may not be able to appear unless appropriate protection measures were taken. In response, police were notified and maintained a presence in the school parking lot, and DASD's Assistant Superintendent (whose duties include school security) stayed inside the gym with Suniaga.

Superintendent Lonardi scheduled a meeting for all interested parents to attend on the afternoon preceding the first Back to School Night to discuss Suniaga's transfer. Prior to the meeting, a post appeared on the iPetition stating "if you or someone you know has received inappropriate contact or comments from Mr. Suniaga (PE/Health teacher) at any school in Downingtown please email a complaint." Id. ¶ 102. The post ended with the email address of former HR director Standish.

On August 23, 2019, Standish advised Suniaga in writing that he was being placed on administrative leave with pay and

16

that until further notice he was not to enter DASD property,
attend school activities as an employee, or have any contact
with students, employees, or the school director about any DASD
matter. The letter gave no reasoning other than the statement
"we are investigating, however, and based on the outcome of that
investigation, disciplinary measures may be imposed at some
future date." Id. ¶ 107.

On that same day (August 23), Defendant Murphy posted the
following statement on the iPetition: "Update! We did it! Mr.
Suniaga has been placed on administrative leave pending further
investigations." Id. ¶ 108. Attached to that statement was a
copy of an email to Beaver Creek Parents posted by Principal
Lawless on the DASD Blackboard which stated "[t]he School
District appreciates the input received about Mr. Suniaga and
has received new allegations that will be investigated. While we
investigate the new allegations, Mr. Suniaga is being placed on
administrative leave and will not be reporting to work." Id. ¶
109. The email further stated that "[s]ome of the new
allegations came from people with firsthand information and we
will be interviewing those people." Id. ¶ 110. The email
contained another solicitation for "people who have witnessed or
been the victim of any inappropriate conduct" to come forward
and be interviewed since DASD could not rely on hearsay. Id. ¶
111. Despite that statement, Suniaga alleges that hearsay served

17

as the sole basis for placing him on administrative leave. Finally, the email confirmed that Defendants had already hired other substitutes to cover for Suniaga.

Suniaga alleges that the controversy at BCES was manufactured after Superintendent Lonardi was told she couldn't fire Suniaga after the Loudermill hearing. According to the Amended Complaint, it became a shared goal of her subordinates and the "marching orders of the School District's counsel" to try and force Suniaga to resign. Id. ¶ 115.

On August 27, 2019, Suniaga experienced a panic attack for the first time. Thereafter, his mental health issues worsened as all of the aforementioned events unfolded, and Suniaga received medical treatment for the physical/emotional manifestations of his mental health issues, all of which, according to Suniaga, persist to this day.

On September 19, 2019, DASD issued its official Notice of Directives resulting from the Loudermill hearing on May 29, 2019. The Notice imposed a thirty-day unpaid disciplinary suspension together with the other aforementioned directives. However, the Notice contained a new provision titled "Social Media," which stated that "[y]ou must not post anything on social media that references appearance of people or is inappropriate for a teacher to communicate to students, such as

the video you posted of the rear end of a woman on your

Facebook." Id. ¶ 118. Another provision followed which stated:

> None of the directives contained herein are intended
> to interfere with your First Amendment rights and
> should not be construed as prohibiting speech that is
> protected by the First Amendment. However, we caution
> you that speech that may be protected in one context
> may not be protected where it may cause or does cause
> a disruption of school. Your conduct, including the
> video that you posted has caused a disruption of the
> work of administrators.

Id. ¶ 119.

No allegation was presented at the Loudermill hearing

regarding anything on Suniaga's Facebook, nor was he ever

questioned about the video. Suniaga alleges that sometime after

the Loudermill hearing, someone associated with (or at the

request of) DASD hacked into the private portion of his Facebook

and copied an attachment sent by an acquaintance that was never

posted on the public section of Suniaga's account. Suniaga

states that he never communicated with students through

Facebook. Suniaga alleges that the hacked video was never posted

publicly on the internet.[4]

Following the issuance of the official Notice of

Directives, the Union filed a second grievance[5] on behalf of

Suniaga with respect to discipline, reprimand, reduction in

---

[4]    Attorney Levin produced the video to counsel for Suniaga's Union on
August 22, 2019.
[5]    The first grievance filed was in relation to the Loudermill hearing and
DASD's "proceedings against Suniaga without just cause as well as the
punishment imposed on Suniaga." Id. ¶ 71.

status, compensation, and professional advantages imposed
without just cause in violation of the Union's Collective
Bargaining Agreement with DASD. DASD ultimately denied the
grievance and arbitration of the matter is currently pending.

After Suniaga was placed on administrative leave on August
23, Attorney Levin suggested to counsel for the Union that
Suniaga consider a settlement with DASD whereby he would receive
some severance in exchange for signing a release of all claims
and resigning. Thereafter, Suniaga retained private counsel, who
contacted Levin. During this conversation, Levin stated that it
was not in the best interests of either DASD or Suniaga for him
to return there, and he suggested that Suniaga propose a
settlement agreement.

On November 7, 2019, after Suniaga did not submit a
proposed settlement agreement, Levin advised Suniaga's counsel
that DASD intended to direct him to return to work as soon as
possible and that it intended to announce his return to BCES
parents shortly. Suniaga requested that the announcement provide
some name clearing and make clear that a thorough investigation
was completed and there was no credible evidence of misconduct.
Levin also confirmed in a letter on November 7 that Suniaga was
expected to start teaching on November 19.

In response to Suniaga's request, Levin indicated that DASD would only be willing to state "that after investigating the allegations made on social media no one provided any information to the School District that would support an allegation of sexual abuse." Id. ¶ 130. DASD was unwilling to consider the effects of its past publications concerning Suniaga, including a letter published to parents/the public less than three months earlier which announced Suniaga's administrative leave based on "new allegations that will be investigated . . . [that] came from people with firsthand information," which the notice defined as "people who have witnessed or been the victim of . . . inappropriate conduct" and continued to invite witnesses or victims to contact former HR director Standish. Id. ¶ 131.

In response, Suniaga's counsel sent a letter on November 12, 2019, to counsel for the School District Defendants which expressed why DASD's approach created a substantial risk of further, greater harm to Suniaga.

As a result of the aforementioned health issues, Suniaga sought medical treatment with his primary care doctor, who prescribed anti-anxiety and depression medication, which Suniaga continues to take. On November 10, 2019, Suniaga underwent his annual physical exam, and his doctor noted that the high degree of mental and emotional distress Suniaga had been experiencing

for a prolonged period of time was having significant adverse effects on his health. According to the Amended Complaint, Suniaga's health continues to be adversely affected.

Suniaga requested and was granted FMLA (Family and Medical Leave Act) leave, effective November 18, 2019, and remained on medical leave using his accumulated sick days until June 30, 2020.

As the 2019-2020 school year drew to a close, DASD set a deadline of June 30, 2020, for Suniaga to decide if he was going to be able to return to teaching in the District. DASD specifically requested that Suniaga engage in an interactive process with it to determine what, if any, accommodations he required.

DASD's position during a series of discussions on the terms of Suniaga's return remained the same: (1) Suniaga would return to teach at BCES; (2) the parents would receive a notice along the lines of the previously proposed notice with no name clearing; and (3) appropriate measures would be taken to address the "concerns" of any parents. Whether the surveillance of Suniaga throughout the school day was going to be implemented was not specifically addressed.

In response to DASD's request for a proposal, Suniaga's counsel sent a letter to Levin which outlined the considerations

Suniaga had regarding whether he could return to DASD. On June 30, 2020, when DASD had not responded, Suniaga officially tendered his resignation (effective on the first day of the 2020-2021 school year) in a letter to Superintendent Lonardi and the current HR director.

Largely based on these allegations, the Amended Complaint asserts the following eleven counts against the following Defendants:

| | |
|---|---|
| Count I (violation of due process pursuant to 42 U.S.C. § 1983 (property interest in continued public employment)) | All School District Defendants |
| Count II (violation of due process pursuant to 42 U.S.C. § 1983 (liberty interest in reputation)) | All School District Defendants |
| Count III (violation of substantive due process pursuant to 42 U.S.C. § 1983 (equal protection of law)) | All School District Defendants |
| Count IV (request for declaratory judgment) | DASD |
| Count V (conspiracy to deprive Plaintiff of his constitutional rights) | All Defendants |
| Count VI (claim for attorneys' fees and costs pursuant to 42 U.S.C. § 1988) | All Defendants |
| Count VII (state law claims for defamation) | All individuals named as Defendants |
| Count VIII (intentional infliction of emotional distress) | All individuals named as Defendants |
| Count IX (intentional interference with contractual relations and prospective contractual relations) | All individuals named as Defendants |

| Count X (invasion of privacy and false light) | All individuals named as Defendants |
|---|---|
| Count XI (loss of consortium) | All Defendants |

In response, Defendants DASD, Principal Lawless, Superintendent Lonardi, Principal Mulvey, and former HR Director Standish filed a Motion to Dismiss for failure to state a claim. Rebecca German (one of the non-School District Defendants) filed a separate Motion to Dismiss for failure to state a claim. These motions are now before the Court.

**III. LEGAL STANDARD**

A party may move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). When considering such a motion, the Court must "accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party." DeBenedictis v. Merrill Lynch & Co., 492 F.3d 209, 215 (3d Cir. 2007).

To withstand a motion to dismiss, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). This "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. Although a plaintiff is

entitled to all reasonable inferences from the facts alleged, a plaintiff's legal conclusions are not entitled to deference, and the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986).

The pleadings must contain sufficient factual allegations so as to state a facially plausible claim for relief. See, e.g., Gelman v. State Farm Mut. Auto. Ins. Co., 583 F.3d 187, 190 (3d Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009)). In deciding a Rule 12(b)(6) motion, the Court limits its inquiry to the facts alleged in the complaint and its attachments, matters of public record, and undisputedly authentic documents if the complainant's claims are based upon these documents. See Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994); Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).

IV.   **DISCUSSION**

A.   **The School District Defendants' Motion to Dismiss**

1.   Count I

Count I alleges a violation of due process based on a property interest in continued public employment. To state a procedural due process claim under Section 1983, a plaintiff must allege that (1) he was deprived of an interest encompassed within the Fourteenth Amendment's protection of life, liberty, and property; and (2) the procedures available to the plaintiff did not provide due process of law. Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir. 2000). The property interested alleged here is tenured public employment.

The School District Defendants (SDDs) argue that the second element has not been met because they complied with the requirements of due process by sending Suniaga a Notice of Allegations on May 14, 2019, and holding a hearing on May 29, 2019. Here, the Notice of Allegations specifically asserted the following:

> 1. on or about Monday, May 6, 2019, you said in one or more classes that students should look at one or more girls to see how they developed since the beginning of the school year. Your conduct caused male students to make inappropriate statements causing one or more students to feel badly;
>
> 2. you asked girls to raise their hands if they are shaving;

3. you called out girls in class and described them as
tall or less developed and discussed their height and
weight;

4. on or about Thursday, May 2, 2019, you pulled up a
female student's picture on your computer and said:
"what happened to you? You used to be cute" or words
to that effect.

Am. Compl. ¶ 47, ECF No. 5.

While the pre-deprivation hearing is not required to be a
trial of the issues, a tenured public employee is "entitled to
oral or written notice of the charges against him, an
explanation of the employer's evidence, and an opportunity to
present his side of the story." Cleveland Bd. of Educ. v.
Loudermill, 470 U.S. 532, 546 (1985). Suniaga argues that this
right to due process also applies to employment decisions that
fall short of discharge, such as suspensions and required
administrative leaves.

However, the cases Suniaga cites are inapplicable to this
situation, where he was placed on administrative leave with pay.[6]
See Dee v. Borough of Dunmore, 549 F.3d 225, 230 (3d Cir. 2008)
(dealing with a property interest under a Pennsylvania statute
which stated that "[n]o person employed in any . . . fire force
of any borough shall be suspended, removed or reduced in rank"

---

[6]    A "Loudermill hearing" is simply a pre-termination hearing intended to
give the employee an opportunity to respond to allegations prior to being
terminated. The hearing "should be an initial check against mistaken
decisions – essentially, a determination of whether there are reasonable
grounds to believe that the charges against the employee are true and support
the proposed action." Cleveland Bd. of Educ., 470 U.S. at 545-46.

without cause); Gilbert v. Homar, 520 U.S. 924, 929 (1997)
(observing that in situations "where the employer perceives a
significant hazard in keeping the employee on the job, it can
avoid the problem by suspending with pay" (quoting Cleveland Bd.
of Educ., 470 U.S. at 544-45)). Additionally, the allegations,
if true, that a teacher was making inappropriate comments toward
female students, could constitute a perceived "significant
hazard." A school district has a strong interest in protecting
students and maintaining public confidence in the school system.
Therefore, DASD was entitled to temporarily suspend Suniaga,
provided that it was for a reasonably short period of time and
with pay.

Suniaga also argues that he was denied due process because
he was never provided with a written summary of the statements
that DASD alleged constituted the evidence supporting the
charges made in the May 14, 2019, Notice of Allegations.
However, Suniaga does not cite any case law that supports his
claim that he was entitled to a written summary of these
statements. To the contrary, Suniaga's own brief accurately
states that a tenured public employee is "entitled to . . . an
explanation of the employer's evidence." Pls.' Resp. Opp'n
Defs.' Mot. Dismiss 26, ECF No. 35 (quoting Cleveland Bd. of
Educ., 470 U.S. at 546). The Amended Complaint also acknowledges
that Levin provided Suniaga with an explanation during the

hearing: "Levin represented on several occasions that he had numerous statements from students in the class who witnessed the alleged events." Am. Compl. ¶ 54, ECF No. 5.

Suniaga argues that the Mulvey correspondence (the email informing parents that an investigation was being conducted concerning student allegations against Suniaga) led to a public reaction that made any procedure thereafter of little value. This connection is highly attenuated and the argument seems to be that any Loudermill hearing held after the distribution of the Mulvey correspondence was of little value because Suniaga's reputation had already been damaged. This argument concerning the damage to Suniaga's reputation is therefore more properly addressed in Count II.

As a result of the foregoing, because Suniaga was suspended with pay and was provided an explanation of the evidence, he fails to state a claim for violation of due process based on a property interest in continued public employment. Consequently, SDDs' Motion to Dismiss will be granted with respect to Count I.

### 2.   Count II

#### a.   Violation of Due Process

Count II alleges a violation of due process based on a liberty interest in Suniaga's reputation. "[T]o make out a due process claim for deprivation of a liberty interest in

reputation, a plaintiff must show a stigma to his reputation
plus deprivation of some additional right or interest." Hill v.
Borough of Kutztown, 455 F.3d 225, 236 (3d Cir. 2006) (citing
Paul v. Davis, 424 U.S. 693, 701 (1976)). This is referred to as
the "stigma-plus" test. Id. "The creation and dissemination of a
false and defamatory impression is the 'stigma,' and the
termination is the 'plus.'" Id. SDDs argue this claim is
deficient because Plaintiffs do not allege that any information
provided in the Mulvey correspondence was false, nor could they.

Plaintiffs allege that the following phrases in the Mulvey
(Principal of Marsh Creek Sixth Grade Center) correspondence,
see Am. Compl. Ex. A 1, ECF No. 5, were stated in a manner
intended to create a false impression that there were facts
serious enough to warrant notification to the parents of all
sixth-grade students of allegations of wrongful conduct by
Suniaga being made by multiple students, and that DASD was
taking some action:

> As you may have heard, allegations have been made that
> your child's Wellness teacher has made inappropriate
> comments to students in a class. . . . the witnesses
> are students . . . the district will follow the law .
> . . [w]e share you [sic] concerns.

Viewing the facts in the light most favorable to the
Plaintiffs, these statements do not create a false impression
that Suniaga had in fact done what was alleged to be done, given
that the email classifies the reports as allegations, rather

than facts, and simply professes that the district will follow the law.

Plaintiffs also allege that one of the emails Principal Lawless sent created a false impression that the allegations were true. The email stated that

> a parent brought a concern to the principal's attention regarding an inappropriate comment made by Mr. Suniaga. I cannot disclose the comment, but I can say that I agree it was not appropriate.[7]

Id. Ex. A 2.

This email was allegedly posted within minutes after the posting of an email by "Concerned [Beaver Creek] Parents," which stated that

> Suniaga was suspended during the 2018-19 school year after making inappropriate comments about his female students' breast development in front of the class.

Id. Ex. A 10.

Principal Lawless's email was posted almost immediately after the posting of the email from "Concerned [Beaver Creek] Parents," see id., charging Suniaga with making inappropriate comments about female students. Thus, Lawless's email, in light of the statement contained in the email from "Concerned [Beaver Creek] Parents," see id., created the "stigma" of the false and

---

[7]     SDDs defend this statement by arguing that at the time of this email, the School District believed that the comment had occurred. This is an issue more appropriately dealt with at the motion for summary judgment stage.

defamatory impression that Suniaga made inappropriate comments about his female students' breast development in class.

Having established the "stigma" component at this stage of the proceedings, the only component remaining is the "plus." Here, the parties agree that the "plus" component is satisfied by Suniaga's claim of constructive termination. See Hill, 455 F.3d at 236.

Although Suniaga has sufficiently stated a claim for deprivation of a liberty interest in reputation as it pertains to Defendant Lawless, but not as to any of the other School District Defendants, the question then becomes whether Lawless is entitled to qualified immunity, meaning that while her actions may give rise to a constitutional violation, she is protected from suit by reason of public policy. See Harlow v. Fitzgerald, 457 U.S. 800, 813 (1982). Additionally, the Court must consider whether DASD would be liable under a respondeat superior theory.

b.   Qualified Immunity

The Third Circuit has stated that, at the pleading stage, "qualified immunity will be upheld on a 12(b)(6) motion only when the immunity is established on the face of the complaint." Thomas v. Indep. Twp., 463 F.3d 285, 291 (3d Cir. 2006). A public official sued under § 1983 for a constitutional

violation is entitled to qualified immunity "unless it is shown that the official violated a statutory or constitutional right that was 'clearly established' at the time of the challenged conduct." Plumhoff v. Rickard, 572 U.S. 765, 766-67 (2014) (citing Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)).

A right is "clearly established" when its "contours . . . [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Wilson v. Layne, 526 U.S. 603, 615 (1999) (citing Anderson v. Creighton, 483 U.S. 635, 640 (1987)); see also Hope v. Pelzer, 536 U.S. 730, 741 (2002) (observing that courts should ask "whether the state of the law [at the relevant time] . . . gave respondents fair warning that their alleged [conduct] . . . was unconstitutional"). Courts "typically look to Supreme Court precedent or a consensus in the Courts of Appeals to give an officer fair warning that his conduct would be unconstitutional." Kedra v. Schroeter, 876 F.3d 424, 450 (3d Cir. 2017).

It is not enough that the right is defined at a high level of generality; rather, "[t]he dispositive question is 'whether the violative nature of particular conduct is clearly established.'" Mullenix v. Luna, 577 U.S. 7, 12 (2015) (quoting al-Kidd, 563 U.S. at 742).

> However, it need not be the case that the exact
> conduct has previously been held unlawful so long as
> the "contours of the right" are sufficiently
> clear, <u>Anderson</u>, 483 U.S. at 640, such that a "general
> constitutional rule already identified in the
> decisional law" applies with "obvious clarity," <u>Hope</u>,
> 536 U.S. at 741. "If the unlawfulness of the
> defendant's conduct would have been apparent to a
> reasonable official based on the current state of the
> law, it is not necessary that there be binding
> precedent from this circuit so advising." <u>Brown v.
> Muhlenberg Twp.</u>, 269 F.3d 205, 211 n.4 (3d Cir.
> 2001). "[O]fficials can still be on notice that their
> conduct violates established law even in novel factual
> circumstances," because the relevant question is
> whether the state of the law at the time of the events
> gave the officer "fair warning." <u>Hope</u>, 536 U.S. at
> 741.

<u>Kedra</u>, 876 F.3d at 450.

Here, the Plaintiffs point to <u>Hill v. Borough of Kutztown</u>,
455 F.3d 225 (3d Cir. 2006), as providing notice to Principal
Lawless that her conduct was unconstitutional. Plaintiffs allege
that under <u>Hill</u>,

> [t]he defendants assertion that they are entitled to
> qualified immunity because it was not clearly
> established that school administrators violate a
> teacher's rights by communicating with students'
> parents about the investigation of allegations against
> the teacher ignores the fact that teachers had a
> clearly established constitutionally protected liberty
> interest in their reputation since at least
> 2006. See <u>Hill v. Borough of Kutztown</u>, 455 F.3d 225,
> 236 (3d Cir. 2006). Much of the defendants'
> communications with parents and the public at large
> contained false and defamatory statements about
> Suniaga and resulted in Suniaga suffering an adverse
> employment action at the direction DASD, a public
> employer. No reasonably informed school district
> official could reasonably believe their actions were

lawful. Consequently, DASD defendants are not entitled
qualified immunity.

Pls.' Resp. Opp'n Defs.' Mot. Dismiss 34-35, ECF No. 35.

To the extent that Plaintiffs claim that Hill stands for
the proposition that a public employee's liberty interest in his
reputation is violated by publicly accusing him of misconduct
(and that the communications with parents and the public here
"contained false and defamatory statements"), such a proposition
is stated at a "high level of generality," which the Supreme
Court has held is insufficient to define the law at
issue. See Mullenix, 577 U.S. at 12; see also Mammaro v. N.J.
Div. of Child Prot. & Permanency, 814 F.3d 164, 169 ("We must
frame clearly established law 'in light of the specific context
of the case, not as a broad general proposition.'" (quoting
Saucier v. Katz, 533 U.S. 194, 200-01 (2001))); Kedra, 876 F.3d
at 449 ("[W]hile '[i]ndividuals indeed have a broad substantive
due process right to be free from "unjustified intrusions on
personal security,"' that defines the right at issue at too high
a level of generality." (citation omitted)). Once the law is
framed at the appropriate level of specificity,[8] it becomes clear

---

[8]     "Defining a right at the appropriate level of specificity is often the
most critical aspect of a qualified immunity analysis." Sauers v. Borough of
Nesquehoning, 905 F.3d 711, 716 (3d Cir. 2018). Here, the appropriate
question to ask is whether a reasonable school official would have been on
notice that sending an email to parents implying that a teacher engaged in
wrongful conduct towards sixth-grade students is unconstitutional. The most
analogous case is Doe v. Purdue Univ., 928 F.3 652 (7th Cir. 2019), where a
stigma-plus claim was established when a university official publicly

that Hill would not provide sufficient notice to a reasonable school official that her conduct was unconstitutional.

As a result of the foregoing, Principal Lawless will be granted qualified immunity with respect to Count II.

### c.    Respondeat Superior Liability

As relevant to Count II, SDDs argue that there is no respondeat superior liability for DASD under Monell v. Dep't of Social Servs. of City of N.Y., 436 U.S. 658, 691-94 (1978). However, there are three ways in which a municipality can be liable under Monell, including if its employee "acted pursuant to a formal government policy or a standard operating procedure long accepted within the government entity" or if "an official with authority has ratified the unconstitutional actions of a subordinate, rendering such behavior official for liability purposes." McGreevy v. Stroup, 413 F.3d 359, 367 (3d Cir. 2005).

Plaintiffs allege that the "acts undertaken by each of the named [SDDs] were undertaken after deliberation with and at the express direction of the ultimate policy makers of the School District such that their decisions to adopt the particular

---

disclosed a finding that a student was guilty of sexual violence towards another student. Purdue would not have provided notice to Principal Lawless that her conduct was unconstitutional. The instant case occurred at the sixth-grade level, not the university level, involved alleged misconduct toward minors, rather than adults, and involved alleged wrongful conduct by a teacher towards his students rather than student to student misconduct.

courses of action alleged herein constitutes the official policy of the Defendant School District." Am. Compl. ¶ 154, ECF No. 5. Without alleging sufficient facts (such as who the policy maker was that ratified Lawless's email), this is merely a conclusory statement that is insufficient to state a plausible claim for Monell liability.

As a result of the foregoing, SDDs' Motion to Dismiss will be granted with respect to Count II as to all School District Defendants because Lawless is entitled to qualified immunity and, under the facts as stated, DASD cannot be held liable under Monell.

### 3.   Count III

Plaintiffs withdraw Count III of the Amended Complaint (claim for violation of substantive due process/equal protection). SDDs' Motion to Dismiss will therefore be granted with respect to this claim.

### 4.   Count IV

Count IV is a request for declaratory judgment based on the alleged unconstitutional exchange between Attorney Levin and Suniaga's counsel involving potential releases and a settlement agreement, to which Suniaga did not agree. The right to specifically seek to have the court declare that a state actor is enjoined from maintaining a custom, policy, practice, or law

that violates the constitutional rights of citizens is
authorized by the Federal Declaratory Judgment Act, 28 U.S.C. §§
2201, 2202. However, Plaintiffs do not plead sufficient facts
that allow the Court to reasonably infer that, under the
circumstances of this case, a reduction in disciplinary measures
in exchange for a release of claims is unconstitutional.
Consequently, SDDs' Motion to Dismiss will be granted with
respect to this claim.

> 5.   Count V

Count V alleges a conspiracy to deprive Suniaga of his
constitutional rights. A cause of action for civil conspiracy
under Pennsylvania state law requires plaintiffs to allege: "(1)
a combination of two or more persons acting with a common
purpose to do an unlawful act or to do a lawful act by unlawful
means or for an unlawful purpose; (2) an overt act done in
pursuance of the common purpose; and (3) actual legal damage."
Kline v. Sec. Guards, Inc., 386 F.3d 246, 262 (3d Cir. 2004)
(quoting McGuire v. Shubert, 722 A.2d 1087, 1092 (Pa. Super. Ct.
1998)).

Additionally, "[p]roof of malice, i.e., an intent to
injure, is essential in proof of a conspiracy." Thompson Coal
Co. v. Pike Coal Co., 412 A.2d 466, 472 (Pa. 1979). In this
context, "malice requires that the conspirators act with the

sole purpose of injuring the plaintiff." Sarpolis v. Tereshko,

625 F. App'x 594, 601 (3d Cir. 2016) (citing Thompson Coal Co.,

412 A.2d at 472); see also Conquest v. WMC Mortg. Corp., 247 F.

Supp. 3d 618, 637 (E.D. Pa. 2017) (dismissing a civil conspiracy

claim where the plaintiff "fail[ed] to allege any facts that

suggest the [defendants] acted contrary to their own legitimate

business interests or with the sole intent to harm him").

There are a variety of allegations in the Amended Complaint

that state a plausible claim for conspiracy under Pennsylvania

law. To wit:

> On information and belief, following the May 2019
> Loudermill hearing and before the 2019-2020 school
> year began the School District Defendants formulated a
> plan to constructively terminate Suniaga's employment
> by seeking from parents and students complaints
> and allegations of misconduct by Suniaga sufficient to
> terminate his employment or for which extensive and
> intrusive investigation would be required during which
> the conditions of his employment would become so
> intolerable, humiliating, and hostile that any
> reasonable person would feel forced to resign his
> tenure position.

> At some point between August 1 and August 19, 2018
> [sic], Defendants had agreed upon a plan whereby
> protests by BCES parents would be fomented and focused
> on resisting the transfer of Suniaga to BCES by
> advising parents of the Suniaga's misconduct with
> females students in his sixth grade class that
> resulted in him being unable to return to teach at the
> MCSGC, providing them with Mulvey's May 13 2019 email
> and suggesting that the specific misconduct could not
> be revealed by law but were serious, and that Suniaga
> could not yet be fired, thereby convincing parents
> that Suniaga was a clear and present danger to their
> children and his transfer should be protested.

> On information and belief, sometime before the 2019-
> 2020 school year began Defendants Lawless and Murphy
> spoke to one another on several occasions at length
> and during said conversations either alone or in
> concert with other Defendants and unnamed third
> parties Lawless disclose to Murphy the private,
> personal and confidential employment information
> regarding Suniaga that included the May 2019
> Loudermill hearing allegations and proceedings as
> well as the Mulvey letter and other gossip and
> speculation about Suniaga, and they began to formulate
> a plan to prevent Suniaga from teaching at BCES.

Am. Compl. ¶¶ 85-87, ECF No. 5.

Viewed in the light most favorable to the Plaintiffs, these facts (assuming they are true), would show that Defendants acted with a common purpose to force Suniaga to quit his employment, committed overt acts in furtherance of the conspiracy (such as disclosing confidential employment information), and caused actual legal damage (constructive termination). Plaintiffs also plausibly allege that SDDs' actions were committed with malice and the sole intent to harm Suniaga.

As a result of the foregoing, SDDs' Motion to Dismiss will be denied with respect to the conspiracy claim, except as to DASD, which is immune as explained below in subsection 10.[9]

---

[9]   SDDs also argue that the intra-corporate conspiracy (ICC) doctrine applies here, but this doctrine is inapplicable at this stage of the litigation because SDDs were allegedly not acting within the scope of their official duties. Accepting this allegation as true at this stage of the litigation, the ICC doctrine is inapplicable here.

6.   Count VI

Plaintiffs withdraw Count VI of the Amended Complaint
(claim for attorneys' fees). SDDs' Motion to Dismiss will
therefore be granted with respect to this claim.

7.   Count VII and Count X

Count VII is a state law claim for defamation. A
communication is defamatory "if it tends so to harm the
reputation of another as to lower him in the estimation of the
community or to deter third persons from associating or dealing
with him." Thomas Merton Ctr. v. Rockwell Int'l Corp., 442 A.2d
213, 215 (Pa. 1981) (quoting Birl v. Phila. Elec. Co., 167 A.2d
472, 475 (Pa. 1960)).

In an action for defamation under Pennsylvania law, the
plaintiff must prove: (1) the "defamatory character of the
communication"; (2) its "publication by the defendant"; (3) its
"application to the plaintiff"; (4) the "understanding by the
recipient of its defamatory meaning"; and (5) the "understanding
by the recipient of it as intended to be applied to the
plaintiff." Tucker v. Fischbein, 237 F.3d 275, 281 (3d Cir.
2001) (citing 42 Pa. Stat. and Cons. Stat. § 8343(a) (West
2020)).

Plaintiffs' defamation claim relies on a theory of
defamation by implication. Pennsylvania law permits such a

41

theory where "the words utilized themselves are not defamatory in nature" but "the context in which the[] statements are issued creates a defamatory implication." Mzamane v. Winfrey, 693 F. Supp. 2d 442, 477 (E.D. Pa. 2010) (Robreno, J.) (citing Thomas Merton Ctr., 442 A.2d at 217); see also Graboff v. Colleran Firm, 744 F.3d 128, 136 (3d Cir. 2014) ("[D]efamation may be established where a statement, viewed in context, creates a false implication.").

Count X is a claim for false light invasion of privacy. Under Pennsylvania law, the tort of false light invasion of privacy "imposes liability on a person who publishes material that 'is not true, is highly offensive to a reasonable person, and is publicized with knowledge or in reckless disregard of its falsity.'" Graboff, 744 F.3d at 136 (quoting Larsen v. Phila. Newspapers, Inc., 543 A.2d 1181, 1188 (Pa. Super. Ct. 1988) (en banc)). Pennsylvania courts "consistently apply the same analysis" to defamation and false light claims "when the causes of action are based on the same set of underlying facts." Id. at 137. Analyzing these claims together, SDDs assert a truth defense to these claims and argue that both Counts must be dismissed because there is no allegation that they communicated any information that was untrue.

For the same reasons stated above in relation to Count II,[10] Plaintiffs have sufficiently alleged that the email from Principal Lawless on August 17, 2019, created a false and defamatory implication that Suniaga made inappropriate comments about his female students' breast development in class. By extension, Plaintiffs have also plausibly stated a claim for false light invasion of privacy. However, Plaintiffs have not pled any facts that would allow the same findings with respect to any of the other individual School District Defendants. Consequently, SDDs' Motion to Dismiss Counts VII and X will be granted in part as to all individual School District Defendants except for Lawless, who will continue as a Defendant with respect to these claims.

### 8.   Count VIII

Count VIII is a claim for intentional infliction of emotional distress. Plaintiffs withdraw this claim against SDDs. Consequently, SDDs' Motion to Dismiss will be granted with respect to this claim.

---

[10]   Although Count II was ultimately dismissed against Lawless as a result of qualified immunity, qualified immunity is not applicable to the state law claims, and the reasoning in Count II behind the "stigma-plus" test is still relevant here.

9.   <u>Count IX</u>

Count IX is a claim for intentional interference with contractual relations and prospective contractual relations.

> To set forth a legally sufficient cause of action for intentional interference with contractual or prospective contractual relations, four elements must be pled: (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct.

<u>Pelagatti v. Cohen</u>, 536 A.2d 1337, 1343 (Pa. Super. Ct. 1987).

SDDs argue this Count should be dismissed because the Plaintiffs fail to state any facts to properly allege that the individual School District Defendants intended to harm any contractual relations of Suniaga. However, the facts alleged with respect to the conspiracy claim,[11] if true, plausibly show

---

[11]   The relevant facts are:

> On information and belief, following the May 2019 Loudermill hearing and before the 2019-2020 school year began the School District Defendants formulated a plan to constructively terminate Suniaga's employment by seeking from parents and students complaints and allegations of misconduct by Suniaga sufficient to terminate his employment or for which extensive and intrusive investigation would be required during which the conditions of his employment would become so intolerable, humiliating, and hostile that any reasonable person would feel forced to resign his tenure position.

> At some point between August 1 and August 19, 2018 [sic], Defendants had agreed upon a plan whereby protests by BCES parents would be fomented and focused on resisting the transfer of Suniaga to BCES by advising parents of the Suniaga's

44

that Defendants intended to interfere with Suniaga's employment

contract with DASD. Consequently, SDDs' Motion to Dismiss this

claim will be denied.

### 10.  Count XI

Count XI is a claim for loss of consortium. A claim for

loss of consortium is a derivative claim which is based upon the

outcome of other claims in the suit.

Under the Pennsylvania Political Subdivision Tort Claims

Act, local agencies are liable for acts of their employees only

if those actions fall within certain, defined, categories of

negligence. See 42 Pa. Stat. and Cons. Stat. § 8542(b) (West

2020). Loss of consortium is not identified as a permissible

---

misconduct with females students in his sixth grade class that
resulted in him being unable to return to teach at the MCSGC,
providing them with Mulvey's May 13 2019 email and suggesting
that the specific misconduct could not be revealed by law but
were serious, and that Suniaga could not yet be fired, thereby
convincing parents that Suniaga was a clear and present danger to
their children and his transfer should be protested.

On information and belief, sometime before the 2019-2020 school
year began Defendants Lawless and Murphy spoke to one another on
several occasions at length and during said conversations either
alone or in concert with other Defendants and unnamed third
parties Lawless disclose to Murphy the private, personal and
confidential employment information regarding Suniaga that
included the May 2019 Loudermill hearing allegations and
proceedings as well as the Mulvey letter and other gossip and
speculation about Suniaga, and they began to formulate a plan to
prevent Suniaga from teaching at BCES.

Am. Compl. ¶¶ 85-87, ECF No. 5.

basis for liability. As such, this claim will be dismissed as to DASD.

The Tort Claims Act also provides the individual School District Defendants, as local agency officers, with immunity from liability for acts taken within the scope of their official duties unless the conduct with which they are charged constitutes a "crime, actual fraud, actual malice, or willful misconduct." See id. § 8550. Given that the charges in the Amended Complaint allege actual malice (as well as allow the Court to draw a reasonable inference of willful misconduct), the Tort Claims Act is inapposite here.[12] Consequently, SDDs' Motion to Dismiss this claim will be granted with respect to DASD and denied as to the individual School District Defendants.

### 11.   Immunity Doctrines

SDDs first argue that the Tort Claims Act shields the School District and the other School District Defendants from any tort claims. While DASD is shielded from the conspiracy claim for the same reasons enumerated with respect to the loss of consortium claim (i.e., conspiracy is not listed as one of the possible bases for liability in the Tort Claims Act), the

---

[12]    SDDs also argue that loss of consortium can only arise out of claims for negligence, but Pennsylvania courts have upheld awards for loss of consortium in cases based on claims for, inter alia, intentional interference with prospective contractual relations and defamation. See, e.g., Geyer v. Steinbronn, 506 A.2d 901 (Pa. Super. Ct. 1986).

individual SDDs are not so shielded if they did not act within the scope of their official duties, as Plaintiffs allege. As to the individual SDDs, under Pennsylvania law, they may be held liable if it is shown that their actions "constituted a crime, actual fraud, actual malice or willful misconduct." <u>See</u> 42 Pa. Stat. and Cons. Stat. § 8550 (West 2020).

SDDs next argue that Superintendent Lonardi is immune from all state tort claims under the doctrine of high public official immunity. This doctrine, however, is not applicable here, given that Plaintiffs allege that her actions were not committed in the course of her official duty.

12.  <u>Punitive Damages</u>

Plaintiffs request punitive damages with respect to all Counts except Count IV (the request for declaratory judgment). This request is now moot with respect to Counts I, II, III, VI, and VIII. With respect to the state law claims, SDDs' argument about punitive damages hinges on whether or not the individual SDDs were acting outside the scope of their official duties, as Plaintiffs allege. The Court need not discuss punitive damages related to DASD because any claims requesting punitive damages either do not include DASD as a defendant, or the SDDs' Motion to Dismiss those claims, which prayed for punitive damages, has been granted with respect to DASD.

### B.   <u>Rebecca German's Motion to Dismiss</u>

#### 1.   <u>Count V</u>

Plaintiffs have withdrawn their Count against German for conspiracy. Consequently, German's Motion to Dismiss will be granted with respect to Count V.

#### 2.   <u>Count VI</u>

Plaintiffs have withdrawn their Count against German for attorneys' fees. Consequently, German's Motion to Dismiss will be granted with respect to Count VI.

#### 3.   <u>Count VII and Count X</u>

Count VII asserts a claim for defamation and Count X is one for invasion of privacy and false light.

In relation to the defamation claim, German argues that her statement on the iPetition that "[Suniaga] is a threat to all students and [Suniaga] needs to be listed on Megan's law to protect our young," <u>see</u> Pls.' Resp. Opp'n Def.'s Mot. Dismiss 1, ECF No. 34, is an opinion and not a factual allegation of criminality. However, an opinion can still be capable of defamatory meaning under Pennsylvania law as long as it can "reasonably be understood to imply the existence of *undisclosed defamatory facts* justifying the opinion." <u>Remick v. Manfredy</u>, 238 F.3d 248, 261 (3d Cir. 2001) (internal citation omitted).

German's statement can reasonably be understood to imply the existence of an underlying fact that Suniaga physically abused his students, given that committing a crime of a sexual nature is the only way to earn a spot on the Megan's Law list. Consequently, Suniaga has sufficiently alleged facts that, if true, could support a claim for defamation. German's Motion to Dismiss will therefore be denied with respect to the defamation claim.

In relation to Count X, the false light version of the invasion of privacy cause of action is the only one implicated here. As discussed <u>supra</u> in Section IV.A.7, a claim for false light invasion of privacy is generally governed by the same principles as the claim for defamation, see <u>Graboff v. Colleran Firm</u>, 744 F.3d 128, 137 (3d Cir. 2014). Thus, German's Motion to Dismiss will be denied as to Count X for the same reasons enumerated above.

### 4.   <u>Count VIII</u>

Count VIII is a claim for intentional infliction of emotional distress ("IIED"). To prevail on a claim for intentional infliction of emotional distress, a plaintiff must, "at the least, demonstrate intentional outrageous or extreme conduct by the defendant, which causes severe emotional distress to the plaintiff." <u>Reedy v. Evanson</u>, 615 F.3d 197, 231 (3d Cir.

2010) (quoting <u>Swisher v. Pitz</u>, 868 A.2d 1228, 1230 (Pa. Super. Ct. 2005)).

Pennsylvania courts have found liability on IIED claims "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." <u>Id.</u> at 231-32 (quoting <u>Field v. Phila. Elec. Co.</u>, 565 A.2d 1170, 1184 (Pa. Super. Ct. 1989)); <u>see also</u> <u>Cheney v. Daily News L.P.</u>, 654 F. App'x 578, 583-84 (3d Cir. 2016) ("Pennsylvania courts have found extreme and outrageous conduct only in the most egregious of situations, such as mishandling of a corpse, reckless diagnosis of a fatal disease, and having sexual contact with young children.").

German's statement that Suniaga "is a threat to all students and needs to be listed on Megan's law to protect our young," while a serious charge, does not rise to the level of "extreme and outrageous" conduct recognized under Pennsylvania law. Therefore, the Court will grant German's Motion to Dismiss Suniaga's IIED claim.

　　　　5.　<u>Count IX</u>

Count IX is a claim for intentional interference with contractual relations.

To set forth a legally sufficient cause of action for
intentional interference with contractual or
prospective contractual relations, four elements must
be pled: (1) the existence of a contractual, or
prospective contractual relation between the
complainant and a third party; (2) purposeful action
on the part of the defendant, specifically intended to
harm the existing relation, or to prevent a
prospective relation from occurring; (3) the absence
of privilege or justification on the part of the
defendant; and (4) the occasioning of actual legal
damage as a result of the defendant's conduct.

Pelagatti v. Cohen, 536 A.2d 1337, 1343 (Pa. Super. Ct. 1987)

(citing Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 471

(Pa. 1979); Birl v. Phila. Elec. Co., 167 A.2d 472, 474 (Pa.

1960)).

German relies on Small v. Juniata College, where the

Pennsylvania Superior Court affirmed the trial court's grant of

summary judgment on the issue of intentional interference with

contractual relations in favor of students who succeeded in

voicing enough complaints to get their football coach fired. See

682 A.2d 350, 352 (Pa. Super. Ct. 1996).

Small is distinguishable. First, Small was decided under a

summary judgment standard, not at the motion to dismiss stage.

Second, and most importantly, the court itself purposely limited

its holding to the facts of that case. Id. at 354 ("[U]nder the

facts of this case, student criticism of a college employee with

whom the students must interact, when expressed to the

administration, does not constitute intentional interference

51

with an employment relationship."). Unlike <u>Small</u>'s performance-related criticism of a college coach, the communications in this case implied possible criminal conduct by Suniaga (including placing Suniaga on the Megan's Law list), which, if accepted, would have been grounds for terminating Suniaga's contract with the District.

Viewing the facts in the light most favorable to the Plaintiffs, they have alleged sufficient facts to state a plausible claim for intentional interference with contractual relations between Suniaga and DASD. Consequently, German's Motion to Dismiss Count IX will be denied.

    6.   <u>Count XI</u>

Count XI is a claim for loss of consortium. German argues that any claim by Mrs. Suniaga is derivative of the claims of her husband and must be dismissed if Suniaga's claims are dismissed. Since the Court has upheld several of Suniaga's claims against German, the loss of consortium claim will stand and German's Motion to Dismiss will be denied with respect to Count XI.

    C.   **Leave to Amend**

Leave to amend should be freely granted. <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962). Leave to amend is not futile in this case and will therefore be granted. Plaintiffs may file a Second

Amended Complaint as to Counts I, II, IV, VII (with respect to the School District Defendants), VIII (with respect to Rebecca German), and X (with respect to the School District Defendants). Given that Counts III, V (with respect to Rebecca German), VI, and VIII (with respect to the School District Defendants) have been withdrawn, they are dismissed and may not be re-asserted without leave of Court.

## V.   CONCLUSION

For all of the aforementioned reasons, SDDs' Motion to Dismiss and German's Motion to Dismiss will be denied in part and granted in part as follows:

| Counts | Defendants Remaining |
|---|---|
| Count I (violation of due process pursuant to 42 U.S.C. § 1983 (property interest in continued public employment)) | None |
| Count II (violation of due process pursuant to 42 U.S.C. § 1983 (liberty interest in reputation)) | None |
| Count III (violation of substantive due process pursuant to 42 U.S.C. § 1983 (equal protection of law)) | None |
| Count IV (request for declaratory judgment) | None |
| Count V (conspiracy to deprive Plaintiff of his constitutional rights) | Superintendent Lonardi, former HR Director Standish, Principal Mulvey, Principal |

| | Lawless, Murphy, Chicosky, and Gulati |
|---|---|
| Count VI (claim for attorneys' fees and costs pursuant to 42 U.S.C. § 1988) | None |
| Count VII (state law claims for defamation) | Principal Lawless, German, Murphy, Chicosky, and Gulati |
| Count VIII (intentional infliction of emotional distress) | Murphy, Chicosky, and Gulati |
| Count IX (intentional interference with contractual relations and prospective contractual relations) | All individuals named as Defendants |
| Count X (invasion of privacy and false light) | Principal Lawless, German, Murphy, Chicosky, and Gulati |
| Count XI (loss of consortium) | All individuals named as Defendants |

An appropriate order follows.