**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LEO SUNIAGA**, *et al.* | : | |
| | : | **CIVIL ACTION** |
| | : | |
| v. | : | **No. 20-2283**[1] |
| | : | |
| **DOWNINGTOWN AREA** | : | |
| **SCHOOL DISTRICT**, *et al.* | : | |

**McHUGH, J.**                                                    **February 5, 2025**

**MEMORANDUM**

This case illustrates the challenges of administering a public school system in the internet age, and the perils of unfounded accusations spread by social media. Plaintiff Leo Suniaga taught for many years without incident in the Downingtown Area School District. In April 2019, he was placed on administrative leave with pay after making comments deemed inappropriate in a sixth-grade health class. Following an investigation and hearing, he was suspended without pay. In August, in what appears to be an attempt to defuse any lingering controversy, Mr. Suniaga was transferred to a nearby elementary school for the 2019-2020 school year. His transfer ignited a social media firestorm and gave rise to additional accusations, some of which were wildly inaccurate. Mr. Suniaga was again placed on administrative leave with pay, but then cleared after an investigation found no credible evidence supporting the new allegations. He was subsequently granted FMLA leave and remained on medical leave for the remainder of the school year. Regrettably, in June 2020, Mr. Suniaga resigned.

---

[1] This action was reassigned to me in August 2023, at which time discovery was still not complete.

Plaintiff now advances constitutional due process claims under 42 U.S.C. § 1983, alleging that the School District and several School District officials deprived him of a property interest in continued public employment, and a liberty interest in his reputation.[2]  Plaintiff also asserts common law tort claims against School District officials for defamation, false light, tortious interference, and conspiracy.  Additionally, Plaintiff advances claims against several individuals who participated in the social media campaign against him, asserting intentional infliction of emotional distress, defamation, false light, tortious interference, and conspiracy.[3]  The School District Defendants and one of the non-School District Defendants, Rebecca German, have moved for summary judgment.  For the reasons that follow, the motions will be granted in part and denied in part.

## I.  Factual Background

Plaintiff Leo Suniaga worked for twenty-four years in the Downingtown Area School District (the "School District") as a health and physical education teacher.  ECF 136-1 at ¶ 3. During this time, Mr. Suniaga was a member of the Downingtown Area Education Association, a local union of the Pennsylvania State Education Association.  ECF 136-21.  His employment with the School District was governed by a Collective Bargaining Agreement.  *Id.*

In 2014, Mr. Suniaga accepted a position at the Marsh Creek Sixth Grade Center ("Marsh Creek"), where he was tasked with implementing the school's "Wellness" curriculum.[4]  ECF 136-

---

[2] Plaintiff's liberty interest claim is asserted only against the School District.  *See* Third Am. Compl. ¶¶ 242-43, ECF 59.

[3] Additionally, Jacquelyn Suniaga, Mr. Suniaga's wife, brings a loss of consortium claim.  *Id.* at ¶¶ 258-59.

[4] The Wellness curriculum included instruction on adolescent health and development.  ECF 136-1 at ¶¶ 12-13.

1 at ¶¶ 3, 10. In April 2019, Suniaga started a unit on human growth and development, covering issues of puberty and sexual health.[5] *Id.* at ¶¶ 25-33.

### A. The Marsh Creek Allegations

On May 6, 2019, Marsh Creek's Principal, Thomas Mulvey, received an email from a parent alleging that Mr. Suniaga had made inappropriate comments during class.[6] ECF 130-7. The parent alleged that Suniaga had displayed a picture of their daughter on the board, and asked students to observe how she had "developed."[7] *Id.* Additionally, the parent claimed that Suniaga had asked female students about their shaving habits, commented on their height and weight, and remarked to a student: "you used to be cute." *Id.* Principal Mulvey forwarded the email to Sharon Standish, the School District's Director of Human Resources, who advised Mulvey that she may have to put Suniaga on leave. ECF 130-47 at ¶¶ 38-39. The following day, Principal Mulvey met with several students and the parent regarding the allegations. ECF 130-44 at ¶ 20; ECF 130-13. Mulvey advised Standish that he believed the allegations were credible, and Standish placed Suniaga on administrative leave with pay pending further investigation.[8] ECF 130-47 at ¶ 42.

On May 13, Principal Mulvey informed Marsh Creek parents that "allegations have been made that your child's Wellness teacher has made inappropriate comments to students in a class"

---

[5] According to Suniaga, this unit was intentionally placed at the end of the school year so that parents would have an opportunity to express concerns about the curriculum, or to opt their children out of the unit entirely. ECF 136-1 at ¶¶ 25-27; ECF 136-12.

[6] The May 6 email was sent by the parent of a student who was not in Suniaga's class. ECF 130-7.

[7] During a May 29 hearing, it was revealed that the parent who sent the May 6 email had retracted the allegation that Suniaga had displayed their daughter's picture on the board. Suniaga Hearing 20:3–8, ECF 136-20.

[8] Principal Mulvey, HR Director Standish, and Craig Krusen – Suniaga's local union president – were present at the meeting where Suniaga was informed of the suspension. ECF 130-47 at ¶ 44.

and "[t]he teacher has been placed on administrative leave while an investigation is occurring." ECF 130-42. On May 14, one week into his administrative leave, Suniaga was provided with a Notice of Allegations. ECF 136-17. The allegations largely mirrored those from the May 6 email, including claims that Suniaga had instructed students to "look at one or more girls to see how they developed since the beginning of the school year . . . asked girls to raise their hands if they are shaving . . . called out girls in class and described them as tall or less developed and discussed their height and weight" – and that he had "pulled up a female student's picture on [his] computer and said: 'what happened to you? You used to be cute' or words to that effect." *Id.* Suniaga was informed that he would have an opportunity to address the allegations at an upcoming hearing.[9]

During the May 29 hearing, Mr. Suniaga denied having directed his class to observe the development of his female students. Suniaga asserted that he had pulled language directly from the class textbook which prompted students to: "[l]ook at any group of teens and you will probably see big differences between individuals." Suniaga Hearing 10:21–22, ECF 136-20. According to Suniaga, he displayed that language on the board, and observed: "If you guys look in the class right now at ourselves, you can see that there is a big differential in height and development. Some of you are taller; some of you are shorter."[10] *Id.* at 11:9–13.

As for the shaving comment, Suniaga explained that, after showing students a diagram on body hair development, a male student asked why he had hair on his legs but some of his female

---

[9] Subsequently, on May 20, a student alleged that, during gym glass, Suniaga had "touched and smelled my shirt" and then later commented to the student's "friend about how I smelled good." ECF 130-10. This allegation was discussed during the hearing. Suniaga Hearing 31:18–40:25, ECF 136-20.

[10] Suniaga also denied singling out female students based on their weight. Rather, he claims to have commented that it was "normal for girls to carry a little bit more body fat than males" – but that both males and females "carry certain percentages of body fat and we all need it." Suniaga Hearing 28:19–25, ECF 136-20.

peers did not. Suniaga responded that it was "common practice in our society for the girls to shave their legs" and then asked how many of the female students shaved their legs. *Id.* at 26:9–12. Suniaga acknowledged during the hearing that, in hindsight, he would have handled the situation differently. *Id.* at 26:15–18.

Mr. Suniaga was then questioned about his comment to a student that she "used to be cute." According to Suniaga, he was entering grades on his computer when, by chance, the student for whom he had just entered a grade walked into the room. Suniaga referred to the photograph that accompanied the student's profile in his gradebook, and remarked: "Look at you, you were so cute in the picture." *Id.* at 31:2–3. Suniaga characterized his comment as a simple observation that the student's appearance had changed since the time of the photo, and that "she look[ed] a little more grown up." *Id.* at 31:13–14.

After the hearing, Emilie Lonardi, the School District's Superintendent, suspended Suniaga for thirty days without pay.[11]  ECF 130-46 at ¶ 34.

**B.  Mr. Suniaga's Prior Disciplinary History**

Mr. Suniaga was hired by the School District in 1996. For over twenty years, he taught health and physical education without incident.[12]

During the 2017-2018 Marsh Creek school year, Suniaga was sanctioned twice. In January 2018, Suniaga allegedly touched a student's arm, complimented her on her strength, and sat on the

---

[11] Suniaga was later presented with a Release and Settlement Agreement, which would have reduced the duration of the suspension to nine days.  ECF 136-1 at ¶ 47; ECF 136-22; ECF 130-23; ECF 130-24; ECF 130-47 at ¶ 72.  It is unclear from the record whether Suniaga ever signed the Agreement.

[12] Suniaga was an elementary school teacher from 1996 until 2014.  Prior to the 2014-2015 school year, Suniaga accepted a position with the Marsh Creek Sixth Grade Center.  ECF 136-1 at ¶ 3.

student's back as she completed a push-up.  Although he was not suspended, Principal Mulvey advised Suniaga that his conduct was unsafe and inappropriate, because "references to a student's physique from a teacher could be interpreted as harassment" – and that it was therefore "imperative that [Suniaga] refrain from these types of interactions in the future, or there could be more serious disciplinary consequences."  ECF 130-47 at ¶¶ 28-30; ECF 130-12.

In April 2018, allegations were made that Mr. Suniaga smacked a student in the stomach. ECF 130-47 at ¶ 31.  Initially, HR Director Standish did not believe that the allegation warranted administrative leave.  *Id.*  But during an informal hearing, Standish found portions of Suniaga's testimony to be unreliable, and a video partially capturing the incident appeared to confirm some form of physical contact.  As a result of the video and Suniaga's at-times inconsistent testimony, Standish suspended Suniaga for two days without pay.[13]  *Id.* ¶¶ 32-36; ECF 136-1 at ¶ 23.

The supervisory personnel involved in these prior incidents, Principal Mulvey and HR Director Standish, were also involved in the investigations relevant to this case.

### C.  Transfer to Beaver Creek Elementary School

In mid-August 2019, Superintendent Lonardi, hoping to provide Suniaga a fresh start, transferred Suniaga from Marsh Creek to Beaver Creek Elementary School ("Beaver Creek").[14] ECF 130-47 at ¶ 71.  News of Plaintiff's transfer sparked outrage, particularly on social media.[15]

---

[13] Defendants purport to have attached the letter notifying Suniaga of his 2-day suspension as "Exhibit D-20."  ECF 130-47 at ¶ 36.  There is no such exhibit.

[14] It appears that the idea to transfer Plaintiff was first raised by Tricia Audrain, Suniaga's union representative, during the May 29 hearing.  Given persistent rumors and continued concern from Marsh Creek parents, Audrain believed that a transfer "could be in the best interest of the school and [Suniaga]." Suniaga Hearing 47:7–11, ECF 136-20.

[15] Superintendent Lonardi, in her deposition, described the social media campaign as a "mob."  Lonardi Dep. 91:5–9, ECF 130-37.

Defendant Megan Murphy circulated an online petition protesting Suniaga's transfer, expressing in part: "We are shocked and outraged that [Suniaga] has been placed at Beaver Creek, and do not feel comfortable with him teaching our daughters or being a role model for our sons."[16]  ECF 131-4 at 4.  Over the span of a few days, the petition garnered over 300 signatures and 70 comments, vilifying Suniaga and lodging fresh accusations.  *Id.* at 2.  Defendant Rebecca German remarked: "He is a threat to all students and needs to be listed on Megan's law to protect our young.  Shame on any district who offers him a position."  *Id.* at 5.

Beaver Creek officials sought to address the internet firestorm.[17]  In an August 17 email to parents, Beaver Creek's principal, Dawn Lawless, explained that during the previous year, a Marsh Creek parent had "brought a concern to the principal's attention regarding an inappropriate comment made by Mr. Suniaga."  ECF 130-40.  Lawless added that, while she was not authorized to "disclose the comment," she "agree[d] that it was not appropriate" and was "grateful to the student and parent for bravely bringing this concern to their principal."  *Id.*  Lawless noted, however, that, "[a]fter a thorough investigation . . . it was determined that while Mr. Suniaga's comment was not appropriate, no child was ever touched or put in harm's way."  *Id.*  Principal Lawless assured parents that, though Suniaga had been cleared to return to the classroom, the School District had arranged for "a second adult in his classes at the start of the school year."  *Id.*  This arrangement, Lawless asserted, would provide Suniaga with an opportunity "to demonstrate

---

[16] The petition was titled: "Say NO to Mr. Suniaga at [Beaver Creek]."  ECF 131-4.

[17] On August 16, Principal Lawless emailed Superintendent Lonardi, HR Director Standish, and Assistant Superintendent Robert Reed, stating: "Just letting you know that I'm getting a flood of parent complaints/concerns about [Plaintiff] now that the parent portal is open."  ECF 136-33 at 2.  On August 17, Lawless advised the same group: "Facebook is blowing up and there's mention of getting news media involved."  *Id.* at 1.

that he has learned from his past mistakes in an environment where our families feel safe."[18]  *Id.* Principal Lawless noted that Mr. Suniaga had served as an instructor in the School District's elementary schools for nearly twenty years, during which time "there were never any complaints or concerns."  *Id.*

Principal Lawless' emails failed to mollify concerns.  On August 19, an email to parents from "Concerned Beaver Creek Parents"[19] alleged that Suniaga had been suspended from Marsh Creek for "making inappropriate comments about his female students' breast development in front of the class."  ECF 136-37 at 2.  On August 20, Superintendent Lonardi met with forty Beaver Creek parents, many of whom expressed that they did not believe their kids would be safe in Suniaga's class.[20]  ECF 136-39.  One parent claimed that, twenty years prior, Suniaga had called his elementary aged daughter fat, resulting in an eating disorder and other mental health issues.[21]  *Id.*  At the parent meeting, Lonardi emphasized that the allegations involved inappropriate *comments* – not sexual abuse – and reiterated the School District's commitment to assigning a substitute teacher to Suniaga's classes.  Lonardi also mentioned that one parent per day may have the opportunity to observe Suniaga's class.  *Id.*  After the meeting, school officials received

---

[18] In an August 19 email update to parents, Principal Lawless provided a specific supervisory schedule and reaffirmed that Suniaga would have an assistant with him during all teaching and recess duties.  ECF 136-38.

[19] Principal Lawless believed Defendant Murphy to be the author of this email and asserted that it "would be [an] inappropriate use of email address no matter who sent it."  ECF 136-37 at 1.

[20] Those present at the meeting included Superintendent Lonardi, HR Director Standish, Assistant Superintendent Robert Reed, Communications Director Jenn Shealy, and Board President Jane Bertone.  ECF 130-46 at ¶ 47.

[21] On August 22, Superintendent Lonardi received an email from the former student, Marion Smoot, reiterating the allegation that Suniaga had called her "fat and unattractive."  ECF 130-46 at ¶ 52.  Ms. Smoot reiterated these allegations in a comment on the online petition.  ECF 131-4 at 8-9.

additional allegations of inappropriate comments, and were alerted to a purportedly suggestive video posted to Suniaga's personal Facebook page.[22]  ECF 130-15; ECF 130-25; ECF 130-26; ECF 130-36.

On August 23, Superintendent Lonardi, in consultation with HR Director Standish, decided to again place Suniaga on administrative leave with pay.  ECF 130-47 at ¶ 87.  In an email to Beaver Creek parents, Principal Lawless explained that the School District had received "new allegations," including "from people with firsthand information."  ECF 136-40.  Other allegations, she noted, were second-hand accounts, and "general in nature."  *Id.*  Lawless invited "anyone who is a witness or a victim" to contact HR Director Standish.  *Id.*  Following Suniaga's suspension, Defendant Murphy posted a comment to the petition: "UPDATE!  We did it!  Mr. Suniaga has been placed on administrative leave pending further investigations."  ECF 131-4 at 5.

After an investigation, the School District determined there was insufficient evidence to support the allegations against Mr. Suniaga.  ECF 130-47 at ¶¶ 90-91.  And so, on November 7, Suniaga was directed to return to school.  While counsel discussed the details of Suniaga's return to Beaver Creek – and disputed the extent to which the School District would clear his name – Suniaga was granted FMLA leave.  *Id.* at ¶ 92.

On December 4, Mr. Suniaga informed the School District that, per the advice of his health care provider, he was unable to return to work.  *Id.* at ¶ 103.  Suniaga remained on medical leave

---

[22] Michael Levin, an attorney for the School District, alerted school officials that "the District received a complaint about what [Suniaga] has posted on his Facebook . . . Do you think that this is appropriate for a teacher to post?  The District will be investigating this and other complaints recently received."  ECF 130-15.  In fairness to Mr. Suniaga, it should be noted that the video was not overtly sexual in nature, although it briefly showed the skirt of a motorcycle driver lifted by the wind to reveal that the driver was wearing thong underwear.

for the remainder of the 2019-2020 school year.  Third Am. Compl. ¶ 219, ECF 59.  On June 30, 2020, Mr. Suniaga resigned.  ECF 136-1 at ¶ 1.  In his resignation letter, Suniaga explained that the events of the prior year had resulted in significant reputational harm, both in the classroom and in the community, and that he had decided not to return to a "toxic environment" that would carry a "risk of continued and even greater personal attacks."  ECF 136-42.

## II.    Procedural Posture

Mr. Suniaga and his wife have brought suit against two groups of Defendants.  The School District Defendants include the Downingtown Area School District, Superintendent Lonardi, HR Director Standish, Principal Mulvey, and Principal Lawless.  The non-School District Defendants include Rebecca German, Megan Murphy, Lisa Gulati, and Jennifer Chicosky.

Plaintiff's Third Amended Complaint advances constitutional due process claims under 42 U.S.C. § 1983, alleging that the School District and several School District officials deprived him of a property interest in continued public employment, as well as a liberty interest in his reputation. Plaintiff also asserts state law claims against the School District Defendants for defamation, false light, tortious interference, and conspiracy.[23]  Additionally, Plaintiff asserts claims against the non-School District Defendants for intentional infliction of emotional distress, defamation, false light, tortious interference, and conspiracy.

The School District Defendants and non-School District Defendant Rebecca German have moved for summary judgment.  ECF 130, 131.

---

[23] On December 2, 2020, Judge Robreno issued a memorandum granting in part and denying in part Defendants' Motion to Dismiss Plaintiff's Amended Complaint.  ECF 41.  On February 19, 2021, Judge Robreno issued an order granting in part and denying in part Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint.  ECF 58.  Plaintiff filed a Third Amended Complaint on March 1, 2021.  ECF 59.

III.    **Standard of Review**

This Motion is governed by the well-established standard for summary judgment set forth in Federal Rule of Civil Procedure 56(a), as described by *Celotex Corporation v. Catrett*, 477 U.S. 317, 322-23 (1986).

IV.    **Discussion**

**A.  School District Defendants**

The Fourteenth Amendment provides that "No State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  To prevail on a Section 1983 procedural due process claim, "a plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of life, liberty, or property, and (2) the procedures available to him did not provide due process of law."  *Hill v. Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir. 2006) (quotations omitted); *Robb v. City of Philadelphia*, 733 F.2d 286, 292 (3d Cir. 1984) ("we first must ask whether the asserted individual interests are encompassed within the Fourteenth Amendment's protection of life, liberty, or property; if protected interests are implicated, we then must decide what procedures constitute due process of law") (cleaned up).

Plaintiff contends that he was deprived of (1) a property interest in continued public employment, and (2) a liberty interest in his reputation – without due process of law.

> 1.  *Plaintiff possessed a property interest in continued public employment, but the School District afforded him sufficient process.*

"A state employee has a constitutionally protected property interest in his job if he can only be terminated for cause."  *Montemuro v. Jim Thorpe Area Sch. Dist.*, 99 F.4th 639, 642 (3d Cir. 2024).  In determining whether an employee may only be terminated for cause, Pennsylvania law

controls. *Dee v. Borough of Dunmore*, 549 F.3d 225, 229 (3d Cir. 2008); *Kelly v. Borough of Sayreville*, 107 F.3d 1073, 1077 (3d Cir. 1997) ("State law creates the property rights protected by the Fourteenth Amendment"). Section 5-514 of the Pennsylvania Public School Code sets forth grounds for termination: "The board of school directors . . . shall after due notice, giving the reasons therefor, and after hearing i[s] demanded, have the right at any time to remove any of its officers, employe[e]s, or appointees for incompetency, intemperance, neglect of duty, violation of any of the school laws of this Commonwealth, or other improper conduct." 24 Pa. Stat. Ann. § 5-514. Teachers fall within the definition of "employees." *Id.* § 11-1101(1). Because Section 5-514 provides that teachers may only be fired for cause, Mr. Suniaga possesses a property interest in his continued employment.

An employee may also have a constitutionally protected property interest based on the terms of a collective bargaining agreement (CBA). *Unger v. Nat'l Residents Matching Program*, 928 F.2d 1392, 1397 (3d Cir. 1991) ("it is beyond dispute that a contract with a state entity can give rise to a property right protected under the Fourteenth Amendment"). An employment contract with a "just cause" provision triggers due process protections. *Mancini v. Northampton Cty.*, 836 F.3d 308, 315 (3d Cir. 2016) ("[w]here . . . an employee can only be fired for 'just cause,' the employee develops a cognizable property interest in her continued employment"). Section 1.8 of the CBA governing Suniaga's employment with the School District provides that "[n]o member of the Bargaining Unit shall be disciplined, reprimanded, reduced in rank or compensation or deprived of any professional advantage without just cause." ECF 136-21 at 7. This provision also provides Plaintiff a constitutionally protected property interest in continued employment with the School District.

12

That Mr. Suniaga was suspended rather than terminated does not play a role at this stage of analysis.[24]    Under the CBA, employees are protected not just from termination but from "discipline[] . . . or depriv[ation] of any professional advantage without just cause."[25]    *Id.*    Under these terms, Suniaga possessed a property interest in not being suspended without just cause.    *See Dee*, 549 F.3d at 232 (recognizing a "constitutionally protected property interest in not being suspended without just cause").

Having concluded that Mr. Suniaga possessed a valid property interest, I turn now to whether Suniaga was afforded sufficient process before he was suspended.    *See Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 541 (1985) ("once it is determined that the Due Process Clause applies, the question remains what process is due") (internal quotations omitted).    A due process inquiry "is not a technical conception with a fixed content unrelated to time, place and circumstances."    *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976).    Rather, the inquiry "is flexible and calls for such procedural protections as the particular situation demands."[26]    *Id.*

Procedural due process requires notice and the opportunity to be heard.    *Mathews*, 424 U.S. at 333.    The timing of these requirements, however, may shift depending on the circumstances.    *Wilson v. MVM, Inc.*, 475 F.3d 166, 178 (3d Cir. 2007).    For instance, "where a State must act

---

[24] As I will discuss, however, this distinction is relevant in determining the *level* of process an employee is constitutionally due.

[25] *See Dee*, 549 F.3d at 231 (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 578 (1972)) ("an employee's property interests are created and defined by the terms of his appointment").

[26] The Supreme Court in *Mathews* set forth the following three-factor standard in determining the level of process due: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."    *Mathews*, 424 U.S. at 335.

quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997); *see also Bd. of Regents v. Roth*, 408 U.S. 564, 570 n.7 (1972) ("emergency situations" provide a rare exception to certain due process requirements). Moreover, where "an employer does less than discharge the employee, it can provide less process and still comply with the Constitution." *Licausi v. Allentown Sch. Dist.*, No. 19-1258, 2020 WL 550614, at *5 (E.D. Pa. Feb. 4, 2020) (Wolson, J.).

Mr. Suniaga was twice placed on administrative leave with pay. In both instances, he contends that the School District deprived him of a constitutionally protected property interest.

### a)    The May 7 Marsh Creek Suspension

Mr. Suniaga was suspended on May 7 after a parent alleged that Suniaga had made inappropriate comments during class. Defendants assert that the decision to suspend Suniaga *with pay* is alone sufficient to extinguish Plaintiff's due process claim. I disagree. The Third Circuit's decision in *Dee* provides the controlling standard, and there it held that a suspension "with pay may–*but need not necessarily*–be found to affect" a due process inquiry.[27] *Dee*, 549 F.3d at 231 n.10. I therefore conclude that the School District's decision to suspend Plaintiff with pay may weigh strongly against Plaintiff's claim, but does not extinguish it.

That said, additional factors further weigh in the School District's favor. In *Gilbert v. Homar*, the Supreme Court recognized that a *post*-deprivation hearing may be sufficient "where

---

[27] Defendants rely on *Cormier v. Crestwood Sch. Dist.*, No. 19-1671, 2020 WL 6263027, at *4 (M.D. Pa. Oct. 23, 2020). *Cormier* relied upon *Edwards v. Cal. Univ. of Pa.*, 156 F.3d 488, 492 (3d Cir. 1998) for the proposition that "a suspension with pay does not trigger due process protections." I do not read *Edwards* so broadly, and the Third Circuit's later discussion in *Dee* makes clear that *Edwards* was not meant to establish such a rule.

the employer perceives a significant hazard in keeping the employee on the job." 520 U.S. at 929 (quoting *Loudermill*, 470 U.S. at 544-45). Here, the School District received multiple allegations that Plaintiff had made inappropriate comments toward female students. These allegations, if true, could constitute a "significant hazard." After a preliminary investigation, Principal Mulvey believed the claims were credible. And, while some of the allegations proved to be false or misleading, it was reasonable, given the School District's strong interest in student safety, to place Suniaga on leave with pay pending an investigation. And on May 29, the School District held a post-deprivation hearing. Accordingly, the decision to place Plaintiff on leave with pay without providing a predeprivation hearing did not violate the Due Process Clause of the Fourteenth Amendment.

### b)    *The August 23 Beaver Creek Suspension*

Plaintiff's transfer to Beaver Creek triggered an internet mob. With the 2019-2020 school year fast approaching, school officials were overwhelmed by new allegations and a turbulent social media campaign. Accordingly, Superintendent Lonardi decided to again place Suniaga on paid administrative leave without a hearing. For the reasons that follow, I conclude that the Beaver Creek suspension did not violate Plaintiff's procedural due process rights. I pause, however, to explain why, as compared to the first suspension, this is a closer call.[28]

First, many of the new allegations came via social media. A prompt hearing may have quickly discredited some of these claims, many of which were utterly meritless. Second, there

---

[28] Defendants fail to discuss any of the meaningful differences between the two suspensions. In conclusory fashion, Defendants state: "For the reasons stated in the prior section of this Memorandum of Law" – which only addressed the "with pay" distinction – "placing Suniaga on administrative leave with pay in August of 2019 was justified and was not a violation of procedural due process." ECF 130-1 at 27.

was a dispute as to whether the video posted to Suniaga's Facebook page was public or private. A hearing would have afforded Suniaga an opportunity to demonstrate that the post was private, and therefore that students could not view it. Finally, by late August, school officials had been managing this controversy for over three months. And, while the situation remained volatile, officials by this point should perhaps have had procedures in place to more effectively manage and address allegations.

At the same time, I am mindful of the reality on the ground. The beginning of any new school year comes with its own set of demands. As administrators were engaged in the normal opening process, the reaction to Mr. Suniaga's transfer created another host of issues that school officials needed to address. Deposition testimony, sworn affidavits, and documents produced in discovery paint a picture of a School District scrambling to deal with fresh allegations as well as sustained outrage from parents and social media. It is worth noting that, in May, the unrest stemmed primarily from Marsh Creek parents; by August, however, school officials confronted a new constituency: Beaver Creek parents, many of whom were outraged that the School District had transferred a teacher accused of making inappropriate comments to a classroom with younger students. The School District had a strong interest in ensuring student safety and upholding public confidence amid a social media campaign that had spiraled out of control. And discipline had in fact been imposed after the Marsh Creek incident, and twice before that in the form of a reprimand and brief suspension, heightening reason for concern in the face of new allegations. Therefore, although I sympathize with Mr. Suniaga's frustration – and I agree as a matter of sound management that it would have been preferable for the school to have conducted a predeprivation hearing – I cannot conclude that the failure to do so under all the circumstances here amounts to a constitutional violation.

For the reasons stated, the decision to place Mr. Suniaga on administrative leave with pay on May 7 and August 23 without providing a predeprivation hearing did not violate the requirements of the Due Process Clause. Accordingly, Defendant School District and its officials are entitled to summary judgment on Plaintiff's property interest claim.

>    2. *Suniaga was not deprived of a liberty interest in his reputation because Principal Mulvey's and Principal Lawless' emails did not create a false and defamatory impression for which the School District could be held liable under a ratification theory.*

Plaintiff also maintains that he was deprived of a liberty interest in his reputation in violation of the Fourteenth Amendment. Specifically, Plaintiff contends that Principal Mulvey's and Principal Lawless' email updates to parents – which Plaintiff alleges were ratified by the School District – created a false and defamatory impression that he engaged in inappropriate and unlawful conduct.

At this point, the procedural posture of this case requires explanation. In February 2021, Judge Robreno dismissed Plaintiff's liberty interest claim with prejudice as to all individual School District Defendants on qualified immunity grounds. ECF 58. Nevertheless, as the School District cannot assert a defense of qualified immunity, *Owen v. City of Independence*, 445 U.S. 622, 638 (1980), the merits of the underlying claims against the individual School District Defendants remain relevant.

It is well settled that "reputation *alone* is not an interest protected by the Due Process Clause." *Hill*, 455 F.3d at 236 (emphasis in original) (citations omitted). "Rather, to make out a due process claim for deprivation of a liberty interest in reputation, a plaintiff must show a stigma to his reputation *plus* deprivation of some additional right or interest." *Id.* (emphasis in original). This is commonly referred to as the "stigma-plus" test. *Paul v. Davis*, 424 U.S. 693, 701 (1976).

"In the public employment context, the stigma-plus test has been applied to mean that when an employer creates and disseminates a false and defamatory impression about the employee in connection with his termination, it deprives the employee of a protected liberty interest." *Hill*, 455 F.3d at 236 (quotations omitted).  To satisfy the "stigma" requirement, a plaintiff must demonstrate "that the purportedly stigmatizing statements (1) were made publicly, and (2) were false." *Id.*  The "plus" requirement is satisfied through "termination, constructive discharge, suspension, or demotion." *Otto v. Williams*, No. 15-3217, 2016 WL 3136923, at *5 (E.D. Pa. June 6, 2016) (Diamond, J.).

a)  <i>The Mulvey Email</i>

On May 13, one week after Suniaga was placed on administrative leave from Marsh Creek, Principal Mulvey sent an email update to parents containing the following language:

> As you may have heard, allegations have been made that your child's Wellness teacher has made inappropriate comments to students in a class . . . The teacher has been placed on administrative leave while an investigation is occurring. If the investigation finds that inappropriate comments have been made, the proper processes will be followed . . . Although the alleged inappropriate conduct is by a teacher, the witnesses are students . . . I can promise that this is being properly investigated and that the district will follow the law to take appropriate action, reasonably calculated, to ensure that such inappropriate conduct as alleged does not occur again.  ECF 136-30.

Plaintiff contends that Mulvey's email "contained false and defamatory statements" that "implied the existence of further inappropriate and unlawful conduct."  Third Am. Compl. ¶ 124, ECF 59.

I disagree.  Principal Mulvey's email contains no false statements, nor does it imply the existence of undisclosed inappropriate or unlawful conduct.  Principal Mulvey had an obligation to inform parents about the investigation.  In so doing, Mulvey properly classified the reports as allegations – rather than facts – and noted that action would be taken against Suniaga "*if* the investigation finds that inappropriate comments have been made."  ECF 136-30 (emphasis added).

Moreover, Mulvey did not imply that Suniaga had been accused of anything more serious than making inappropriate comments. Read in context, the reference to "alleged inappropriate *conduct*" comes after Mulvey explained that the investigation involved alleged *comments*, and cannot reasonably be read as Plaintiff suggests. Accordingly, as to Principal Mulvey's email, Plaintiff cannot satisfy the "stigma" requirement, and therefore cannot establish a liberty interest claim.[29]

b)    <i>The Lawless Emails</i>

In an effort to address concerns of Beaver Creek parents in the lead up to the 2019-2020 school year, Principal Lawless sent several emails to students' families regarding Plaintiff's "supervision plan." In her August 17 email, Lawless stated: "During the 2018-19 school year, a parent brought a concern to the principal's attention regarding an inappropriate comment made by Mr. Suniaga. I cannot disclose the comment, but I can say that I agree that it was not appropriate and I am grateful to the student and parent for bravely bringing this concern to their principal." ECF 136-34. Next, in an August 19 message, Lawless explained that Suniaga would be accompanied by an assistant teacher for the 2019-2020 school year. ECF 136-38. Finally, in an August 23 email regarding new allegations, Lawless stated:

> The School District appreciates the input received about Mr. Suniaga and has received new allegations that will be investigated. While we investigate the new allegations, Mr. Suniaga is being placed on Administrative Leave and will not be reporting to work. Some of the new allegations came from people with firsthand information and we will be interviewing those people. However, some of the allegations are general in nature and what can be described as hearsay. ECF 136-40.

---

[29] Because Plaintiff has failed to satisfy the "stigma" component, I need not reach the "plus" component: his alleged constructive termination. Moreover, it is unnecessary to consider whether Principal Mulvey's email was ratified by the School District.

Principal Lawless' emails contain no false statements.  Like Principal Mulvey, she had an obligation to address parents' concerns, and she acted within the scope of her duties to inform parents about Beaver Creek's supervision plan.  Lawless properly refers to the reports as "allegations" rather than as facts.  Her reference to allegations from "people with firsthand information" was true and followed immediately by an explanation that other allegations were "general in nature and what can be described as 'hearsay.'"  *Id.*

Moreover, Principal Lawless' emails do not imply the existence of undisclosed defamatory facts.  As to this point, I focus on one statement in particular: her assertion, in the August 17 email, that: "I cannot disclose [Suniaga's] comment, but I can say that I agree that it was not appropriate." ECF 136-34.  It is unclear which comment Lawless is referencing.  What is clear, however, is that she refers to an inappropriate *comment*; she does not imply that Suniaga engaged in anything more serious, such as improper physical contact.[30]  Indeed, Lawless clarified that "while Mr. Suniaga's comment was not appropriate, no child was ever touched or put in harm's way."  *Id.*

Plaintiff also advances a separate theory.  He observes that Principal Lawless' August 19 email alerting parents to Beaver Creek's supervision plan was sent at 7:56pm, only two hours after the "Concerned Beaver Creek Parents" email – which contained the inaccurate assertion that Suniaga had been suspended from Marsh Creek for "making inappropriate comments about his

---

[30] Though intent is ultimately immaterial for purposes of the "stigma" inquiry, I note that this distinction – that Suniaga had been suspended for alleged inappropriate *comments* – was purposeful.  In the process of drafting the email, Principal Lawless asked Superintendent Lonardi: "How specific can I get with what his 'inappropriate comments' were? Is it accurate to say he was disciplined/suspended for just inappropriate comments[?] Some parents are citing inappropriate touch." ECF 136-33 at 1.  In response, Lonardi advised Lawless to clarify that Suniaga "was disciplined for inappropriate *comments* and that he had however many successful years at the elementary level here in [the School District]."  *Id.* at 3 (emphasis added). Accordingly, Lawless' reference to Plaintiff's "comment" appears to have been intended to assuage concerns regarding allegations swirling on social media that Suniaga had engaged in more serious sexual misconduct.

female students' breast development." ECF 136-37 at 2. Plaintiff alleges that, because Lawless'
email was sent in close succession to the "Concerned Parents" correspondence, it created a
defamatory impression that Plaintiff had, in fact, commented on female students' breast
development. The record does not support this claim. As an initial matter, Lawless' statement: "I
cannot disclose the comment, but I can say that I agree that it was not appropriate," ECF 136-34,
was part of her August 17 email – sent *two days before* the "Concerned Parents" correspondence.
ECF 136-37. Lawless' August 19 email merely provided an update on Suniaga's supervision
schedule – it did not mention specific allegations. ECF 136-38. Plaintiff's contention that
Principal Lawless thanked the authors of the "Concerned Parents" correspondence is also
mistaken. ECF 136 at 29. Lawless starts her email with the following statement: "Dear Beaver
Creek Parents, Thank you for reaching out to me with your concerns." ECF 136-38. Lawless was
plainly thanking parents for contacting school officials with questions and concerns; she was not
thanking – nor does she even reference – the authors of the "Concerned Parents" email.[31]

Plaintiff also repeatedly alludes to the Confidentiality provision of the Policy Manual
prohibiting discrimination in the classroom. ECF 136-19. But that provision does not set forth
any specific protection that he has identified. It states in broad terms that the filing of a complaint
shall be addressed in accordance with "the District's legal and investigative obligations and

---

[31] Indeed, though it is immaterial for purposes of the "stigma" inquiry, I note again that Principal Lawless
appeared *displeased* with the "Concerned Parents" email. At 8:30pm on August 19, Principal Lawless
forwarded that email to other school officials and requested that the School District technology department
investigate the provenance of the message. Principal Lawless believed Defendant Murphy to be the source
and noted that it "would be [an] inappropriate use of email address no matter who sent it." ECF 136-37 at
1.

Applicable Law," which I am hard-pressed to read as establishing any right running to the benefit of the subject of an investigation.

Accordingly, under either theory, no reasonable jury could find that Principal Lawless' email created a defamatory impression. Because the emails cannot reasonably be deemed defamatory, Mr. Suniaga cannot claim he was deprived of a protected liberty interest. It is therefore unnecessary to consider whether the statements were ratified by the School District.

### 3. *Defendants fail to address Plaintiff's state law claims.*

Plaintiff also brings state law claims against the School District Defendants for defamation, false light, tortious interference, and conspiracy. Defendants do not specifically address these claims. As I understand it, Plaintiff's defamation and false light claims form the basis of his liberty interest claim – which failed in large part because the statements at issue did not create a false and defamatory impression in connection with his suspension. The School District Defendants may assume that the state law claims rise and fall with the federal claims, but in the absence of a specific motion I am not inclined to rule in the abstract.

### 4. *Defendants fail to address Plaintiff's conspiracy claim.*

A cause of action for civil conspiracy under Pennsylvania law requires a plaintiff to allege: "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." *Kline v. Sec. Guards, Inc.*, 386 F.3d 246, 262 (3d Cir. 2004) (quoting *McGuire v. Shubert*, 722 A.2d 1087, 1092 (Pa. Super. Ct. 1998)). A civil conspiracy claim, however, is not cognizable in the absence of an underlying tort. *Phillips v. Selig*, 959 A.2d 420, 437 (Pa. Super. Ct. 2008). Instead, a cause of action for civil conspiracy "must be based on an existing independent wrong or tort that would constitute a valid

cause of action if committed by one actor." *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 193 F.3d 781, 789 (3d Cir. 1999) (citation omitted).

Defendants' motion does not address Plaintiff's claim that the School District Defendants conspired to deprive him of his constitutional rights. Necessarily, however, having found no deprivation, Plaintiff cannot recover for a conspiracy to deprive him of constitutional rights. This aspect of his claim will therefore be dismissed. But because the School District Defendants do not address the underlying state law tort claims in their motion, I am unable to address the remainder of the conspiracy claim.

### B. Non-School District Defendant Rebecca German

In addition to his claims against the School District, Plaintiff also advances IIED, defamation, false light, and tortious interference claims against Ms. German for a comment that she posted to the online petition regarding Suniaga's transfer to Beaver Creek: "He is a threat to all students and needs to be listed on Megan's law to protect our young. Shame on any district who offers him a position."[32] ECF 131-4 at 5. Ms. German has moved for summary judgment on all claims. For the reasons that follow, I will grant the motion as to the IIED and false light claims, and deny the motion as to the defamation and tortious interference claims.

#### 1. IIED

Under Pennsylvania law, a claim for IIED requires the intentional or reckless infliction of "extreme and outrageous conduct" such that it "causes severe emotional distress to another" or bodily harm. *Hoy v. Angelone*, 720 A.2d 745, 753 (Pa. 1998). The level of outrageousness

---

[32] Megan's Law is a federal law that requires public disclosure of information regarding registered sex offenders. Pub. L. 104-145.

required to support a claim is extraordinarily high. The misconduct "must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Id.* at 754 (citation omitted). Moreover, a plaintiff must demonstrate "some physical manifestation of injury." *Sarin v. Magee*, 333 F. Supp. 3d 475, 483 (E.D. Pa. 2018). Although I agree that Ms. German's statement was offensive and malicious as those terms are used colloquially, it does not rise to the level of "extreme and outrageous" that has evolved under Pennsylvania case law.[33] Therefore, Ms. German is entitled to summary judgment on Plaintiff's IIED claim.

### 2. Defamation

To prevail on a claim for defamation under Pennsylvania law, a plaintiff must establish: "(1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a conditionally privileged occasion." *Joseph v. Scranton Times L.P.*, 129 A.3d 404, 424 (Pa. 2015) (quoting 42 Pa. C.S. § 8343(a)). "Opinions based on disclosed facts are absolutely privileged, no matter how derogatory they are." *McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 357 (3d Cir. 2020) (quotations omitted). By contrast, opinions that "could reasonably be understood to imply undisclosed defamatory facts"

---

[33] "Examples of such behavior include a driver fatally striking plaintiff's son and, without notifying the authorities, burying the body [in a field;] defendants intentionally falsifying records to implicate plaintiff in a homicide for which plaintiff later went to jail[;] and a doctor telling the press that plaintiff was suffering from a fatal disease when the doctor knew that information was false." *Brown v. Udren Law Offices PC*, No. 11-2697, 2011 WL 4011411, at *4 (E.D. Pa. Sept. 9, 2011) (citing *Papieves v. Lawrence*, 263 A.2d 118 (Pa. 1970); *Banyas v. Lower Bucks Hosp.*, 437 A.2d 1236 (Pa. Super. Ct. 1981); *Chuy v. Eagles Football Club*, 595 F.2d 1265 (3d Cir. 1979)).

are actionable. *Tannous v. Cabrini Univ.*, 697 F. Supp. 3d 350, 364 (E.D. Pa. 2023) (citations omitted).

Ms. German points to *MacElree v. Philadelphia Newspapers, Inc.* for the proposition that her statement was non-actionable pure opinion. 674 A.2d 1050 (Pa. 1996). In *MacElree*, a district attorney sued a newspaper for falsely reporting that a lawyer called him "the David Duke of Chester County." *Id.* at 1052. The Court held that the statement was actionable because, under the circumstances, it "could be interpreted as more than a simple accusation of racism." *Id.* at 1055. A reasonable person, the Court concluded, could broadly construe the statement as "an accusation that appellant was abusing his power as the district attorney, an elected office, to further racism and his own political aspirations." *Id.* at 1054.

Here, Ms. German's statement – that Suniaga posed a threat and "needs to be listed on Megan's law" – could reasonably be interpreted as an accusation that Suniaga sexually abused his students. Ms. German contends that her post conveyed merely that "a teacher *who has actually done the things* that some of the other defendants allege" should not be employed as a teacher. ECF 131-2 at 9 (emphasis added). This characterization is unpersuasive; Ms. German's statement does not refer to "some teacher" – it twice references Mr. Suniaga, identifies him as a threat, and advocates not only adverse employment consequences, but for his placement on a sex offender registry.

Ms. German's reliance on my decision in *Tannous*, *supra*, fares no better. There, a former university professor sued STOPANTISEMITISM.org, a non-profit watchdog organization, for defamation over an article that characterized him as the "antisemite of the week" who "spew[ed] horrifying antisemitism on Twitter in his spare time." *Tannous*, 697 F. Supp. 3d at 365. In concluding that the article did not imply the presence of undisclosed facts, I highlighted the

article's use of cautionary language, which "speculate[d] about what someone in Tannous' position *might* do" but did "not imply that any violence or University-related misconduct *ha*[*d*] occurred." *Id.* (emphasis in original).  In stark contrast to the statements at issue in *Tannous*, Ms. German's post does not equivocate.  In advocating for Suniaga's placement on a sex offender registry, the clear implication is that Suniaga had engaged in serious sexual misconduct.  Because a reasonable jury could conclude that Ms. German's post implied the existence of undisclosed defamatory facts, I will deny Ms. German's motion for summary judgment on Plaintiff's defamation claim.

### 3.  *False Light Invasion of Privacy*

To establish liability for false light under Pennsylvania law, a plaintiff must prove that the defendant "publishe[d] material that 'is not true, is highly offensive to a reasonable person, and is publicized with knowledge or in reckless disregard of its falsity.'"  *Graboff v. Colleran Firm*, 744 F.3d 128, 136 (3d Cir. 2014) (quoting *Larsen v. Phila. Newspapers, Inc.*, 543 A.2d 1181, 1188 (Pa. Super. Ct. 1988) (en banc)).  A publication is "highly offensive" when a reasonable person "would be justified in the eyes of the community in feeling seriously offended and aggrieved by the publicity."  *Krajewski v. Gusoff*, 53 A.3d 793, 807 (Pa. Super. Ct. 2012) (citing Restatement (Second) of Torts § 652E cmt. c).  To establish falsity, a plaintiff may show that a defendant "selectively printed or broadcast true statements or pictures in a manner which created a false impression."  *Tannous*, 697 F. Supp. 3d at 368 (quoting *Graboff*, 744 F.3d at 136).

In assessing falsity, Pennsylvania courts "consistently apply the same analysis" to defamation and false light claims "when the causes of action are based on the same set of underlying facts."  *Graboff*, 744 F.3d at 137.  But to prevail on a false light claim, a plaintiff must prove actual malice.  *Rubin v. CBS Broad. Inc.*, 170 A.3d 560, 568 n.9 (Pa. Super. Ct. 2017); *McCafferty*, 955 F.3d at 360.  Under the standard established by *New York Times v. Sullivan*,

"[a]ctual malice focuses on the defendants' attitude towards the truth, not towards the plaintiff." *Patrick v. Daily Beast Co., LLC*, 674 F. Supp. 3d 159, 162 (E.D. Pa. 2023) (Wolson, J.) (citing *McCafferty*, 955 F.3d at 360); *Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 505 (E.D. Pa. 2010) ("the question of actual malice entails a subjective inquiry into the defendant's belief as to the trustworthiness of the statements at issue"). To establish actual malice, a plaintiff must show that the defendant had "obvious reasons to doubt the veracity of the informant or the accuracy of his reports," *St. Amant v. Thompson*, 390 US. 727, 732 (1968), or "subjective awareness of probable falsity." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 334 n.6 (1974).[34] Moreover, "[a] failure to investigate, standing alone, does not constitute actual malice." *Tucker v. Fischbein*, 237 F.3d 275, 286 (3d Cir. 2001). At the summary judgment stage, courts determine whether the record can support a reasonable jury finding of actual malice by clear and convincing evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-56 (1986).

Because there is no evidence that Ms. German doubted the truth of her statement, Plaintiff's false light claim fails as a matter of law. What appears to have occurred is the following: Ms. German received a notification about the petition on Facebook, scrolled through dozens of comments accusing Mr. Suniaga of a range of inappropriate conduct, formed an opinion about Suniaga based solely on those accusations, and then posted her comment.[35] While Ms. German's

---

[34] Judge Mannion of the Middle District has cogently observed that Pennsylvania courts have not directly addressed whether actual malice should be required in the case of plaintiffs who are not public figures. *See Walter v. Herbert,* No. 23-2166, 2024 WL 2159516, at *10 (M.D. Pa. May 14, 2014). That said, the decisions assume actual malice is a required element.

[35] Some of the comments include: "How can you allow a teacher who molested girls come back to school and teach again. So absurd!! Don't put these little girls at risk again"; "This is what they do with the sick priests… transfer rather than fire"; "His teaching credentials should be revoked and he should be put on the sex offender registry." ECF 131-4. Ms. German's children did not attend school in the district. She was not aware of the controversy prior to viewing the petition on Facebook. ECF 131-5 at ¶¶ 3, 8.

false accusation was imprudent and highly offensive, the record suggests that she sincerely believed in the accuracy of the statement.

Plaintiff is correct that, as a matter of prudence and decency, Ms. German should have "do[ne] [her] research" or "talk[ed] to parents" about the allegations before commenting on the petition. ECF 137 at 12. But that does not suffice under the law. Where there is no evidence that a defendant doubted the truth of her statement, a failure to investigate does not constitute actual malice. Moreover, Plaintiff's assertion that "there is not much worse you can call someone than a child predator" is immaterial for the purposes of the actual malice inquiry, which centers on a defendant's malice towards the truth, not towards the plaintiff. *McCafferty*, 955 F.3d at 359 ("Actual malice is a term of art that does not connote ill will or improper motivation"). Because there is not a sufficient basis for a jury to find by clear and convincing evidence that Ms. German acted with actual malice, Ms. German's motion for summary judgment on Plaintiff's false light claim will be granted.

### 4. Tortious Interference

To establish liability for tortious interference under Pennsylvania law, a plaintiff must prove: "(1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct." *Remick v. Manfredy*, 238 F.3d 248, 263 (3d Cir. 2001).

Ms. German, after characterizing Mr. Suniaga as "a threat" who "needs to be listed on Megan's law," declared: "Shame on any district who offers him a position." ECF 131-4 at 5. Ms.

German's post could reasonably be construed as an attempt to harm Plaintiff's existing contractual relation with the School District, and to prevent Plaintiff from finding employment as a teacher in another district. Plaintiff's tortious interference claim may proceed.

**V.     Conclusion**

Mr. Suniaga's misfortune is ultimately rooted in public reaction that was disproportionate to his missteps as a teacher. But school officials have a duty to take seriously the concerns of parents. Viewed with the benefit of hindsight, Mr. Suniaga's second administrative suspension could have been avoided with a more expeditious resolution. Ultimately, however, Mr. Suniaga was accorded due process, and considering all the circumstances here I cannot conclude that a delay in completing the investigation rises to the level of a Fourteenth Amendment violation. The School District Defendants' Motion for Summary Judgment on Plaintiff's constitutional claims will therefore be granted.

Defendant German's Motion for Summary Judgment will be granted in part and denied in part. An appropriate order follows.


 /s/ Gerald Austin McHugh
United States District Judge